## STATE OF CONNECTICUT *v.* ALPHONSO WHIPPER
### (SC 16181)

Sullivan, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.

Argued February 13—officially released October 2, 2001

*Kent Drager*, senior assistant public defender, for the appellant (defendant).

*Bruce R. Lockwood*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Edward Ricciardi*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. The defendant, Alphonso Whipper, appeals from a judgment of conviction, following a jury trial, of one count each of murder in violation of General Statutes § 53a-54a,[1] felony murder in violation of General Statutes § 53a-54c,[2] and manslaughter

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

in the first degree in violation of General Statutes § 53a-55 (a) (1),[3] and two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3).[4] On appeal, the defendant raises multiple challenges to the validity of his convictions. We affirm the judgment of the trial court in all respects except with regard to the felony murder conviction, and with regard to the conviction of manslaughter in the first degree, which we reverse.

The jury reasonably could have found the following facts. In February of 1996, the defendant and James Gonzalez resided at the Saint Vincent DePaul homeless shelter in Waterbury. On the night of February 21, 1996, the defendant, who had no source of income, asked Gonzalez if he wanted to go out the next day and drink beer together. Gonzalez, who recently had received a social security check for $240, agreed.

At approximately 11:30 a.m. on February 22, 1996, after drinking beer in a nearby parking lot, the defendant and Gonzalez walked to the apartment of Luz Maria Santiago, Gonzalez' former mother-in-law, located in the Trinity Apartments at 41 Prospect Street in Waterbury to continue drinking. To gain entrance to the building, the defendant and Gonzalez waited outside until someone exiting the building opened the door. After they had entered the building, a video surveillance camera located in the lobby of the building recorded the

---

[3] General Statutes § 53a-55 provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person . . . .

"(b) Manslaughter in the first degree is a class B felony."

[4] General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . .

"(b) Robbery in the first degree is a class B felony . . . ."

defendant and Gonzalez while they waited for an elevator to take them to the sixth floor, where Santiago lived.

To gain access to Santiago's apartment, Gonzalez, who had met the defendant two weeks earlier at the homeless shelter, introduced the defendant to Santiago as his friend whom he loved as a brother. Santiago allowed them inside and they sat down in her living room and watched television. Gonzalez gave the defendant money to purchase more beer and the defendant left the apartment to make the purchase. The video surveillance camera in the lobby of the building recorded the defendant's exit and return.

While Gonzalez, Santiago and the defendant were sitting in the living room, Santiago's boyfriend, Hilario Rosado, arrived. After Rosado greeted Santiago and Gonzalez and introduced himself to the defendant, he went into Santiago's bedroom to watch television.

Suddenly, without provocation, the defendant struck Gonzalez on his forehead with an empty beer bottle, causing Gonzalez to bleed profusely. Gonzalez, who was physically disabled, pretended to be dead. When Santiago started to scream, the defendant began to hit her. Hearing Santiago's screams, Rosado came out of the bedroom. The defendant struck Rosado in the head with a crystal vase, breaking the vase and rendering Rosado semiconscious. The defendant next grabbed Rosado around the neck with both of his hands and strangled him to death. When Santiago attempted to call the police, the defendant took the telephone from her and broke it. Santiago then opened a window and attempted to yell for help. The defendant told her that if she did not stop yelling, he would throw her from the window.

The defendant then resumed beating Santiago, breaking two radios and a jar of pickled peppers over her head in an unsuccessful attempt to render her unconscious.

After obtaining a long knife from the kitchen, the defendant went over to Gonzalez and stabbed him in the head, breaking the knife. The defendant then went back into the kitchen and washed his hands. Thereafter, he returned to the living room, reached into Rosado's pants pocket and removed his wallet. The defendant took money from the wallet and then discarded it. He then reached into Gonzalez' pants pocket, removed his wallet, and, after taking money from the wallet, he tossed the wallet aside. The defendant picked up his jacket and left the apartment, fleeing down a rear stairwell. He exited the building via a rear fire door.

After the defendant left, Santiago ran to the fourth floor apartment of the superintendent of the building, Sharon Murphy. Murphy's husband called the police. After police officers arrived, they took Santiago to the Waterbury police headquarters to obtain her statement. Santiago gave Sergeant James Nardozzi her description of the attack and of the perpetrator. Nardozzi then brought Santiago back to Murphy's apartment to view the surveillance videotape from the lobby. Upon seeing the defendant on the surveillance videotape, Santiago identified him as the perpetrator.

That evening, Sergeants Joseph Flaherty and Edward Pekrul, Detective Daniel Coleman, and Officer Edward Mills, all of the Waterbury police department, went to a second floor apartment at 632 Baldwin Street in Waterbury looking for the defendant. The officers found the defendant hiding in a bedroom closet and took him into custody. The defendant's hands had fresh wounds and were bloodied. After searching the defendant, the officers seized $78, the defendant's blue jeans, his shirt, his jacket, a pair of black sweatpants, and a box of cigarettes, all of which had bloodstains on them. The officers then brought the defendant to the police station, where they took his fingerprints. At the station, officers restrained the defendant because he had

become agitated. In particular, the defendant physically resisted officers when a photographer from the state police forensic laboratory attempted to take photographs of his hands.

On March 22, 1996, Sergeant John Gray of the Waterbury police department prepared a photographic array, which included a photograph of the defendant along with photographs of other men with similar facial characteristics. Gray presented the array to Santiago, who identified the defendant immediately as the perpetrator of the crimes.

After a jury trial, the jury found the defendant guilty of one count each of murder, felony murder and manslaughter in the first degree, and two counts of robbery in the first degree. The court sentenced the defendant to a total effective term of sixty years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court improperly denied his postverdict motion for a new trial, in that, against the manifest weight of the evidence and in violation of his right to a fair trial, the state improperly made the scientifically impossible argument to the jury that the test results of three blood samples, which the police had taken from the crime scene, were inculpatory to the defendant. Relying on *State* v. *Hammond*, 221 Conn. 264, 267, 604 A.2d 793 (1992), the defendant maintains that the blood test results actually exculpated him and, therefore, the trial court improperly denied his postverdict motion for a new trial. The defendant also claims that the trial court improperly denied his motion for a new trial because the state's argument to the jury—that the deoxyribonucleic acid (DNA) test results regarding a blood sample taken from the defendant's jeans were inculpatory to the defendant and that the

jury could ignore expert testimony stating that the test was invalid—violated his right to a fair trial. The defendant contends that he offered undisputed expert testimony that the DNA testing conducted on the defendant's jeans had been conducted improperly and therefore was inconclusive and unreliable. The defendant maintains, therefore, that the trial court abused its discretion by denying his motion for a new trial. We disagree.

## A

The following facts are necessary for our resolution of the defendant's first claim. At trial, the state offered the expert testimony of Mary Beth Raffin, the lead criminalist for the forensic biology section of the state forensic laboratory. Raffin testified generally about antigenic substances and enzymes, which are found in the blood, and the results of certain blood tests that she had conducted on various blood samples that the police had taken from the crime scene.

Raffin explained the following with regard to human blood and blood-typing. Human blood consists of two major components, red blood cells and white blood cells. Generally, blood contains far more red blood cells than white blood cells, usually at a ratio of 1000 red blood cells to 1 white blood cell. Antigenic substances, which are distinguished by a combination of the letters A, B and O, are found on the surface of the red blood cells. Enzymes, which are made of protein, are contained inside the red blood cells. Certain enzymes differ from person to person.

Raffin used different tests to identify the type of blood contained in the blood samples submitted to her by the state. First, she tested blood taken from the defendant, Gonzalez, Rosado and Santiago, as well as the blood samples taken from the crime scene and the defendant's clothing, to determine the blood types based on the

antigenic substances from the red blood cells. Because the results revealed that all had type O blood, Raffin next tested the blood samples to determine blood types based on the enzyme phosphoglucomutase (PGM), which is found in ten different types. Raffin's testing showed that the defendant had a PGM type of 2+, 1+. Rosado's PGM type was 1+. Gonzalez and Santiago each had a PGM type of 1+, 1-.

Raffin then tested the samples taken from the crime scene and the defendant's clothing and determined that blood with a PGM type that matched the defendant's was in the samples taken from: the bloodstains found on the two broken radios; the defendant's shirt, sweatpants, and jacket; the $78 found in the defendant's wallet; the kitchen floor; and inside and on top of the kitchen sink. Raffin had found blood with a PGM type that matched the PGM type of both Gonzalez and Santiago in samples taken from bloodstains found on the two broken radios, the defendant's jacket and the broken knife. Additionally, Raffin had found blood with a PGM type that matched the PGM type of Rosado, Gonzalez and Santiago in various other samples taken from the crime scene.

The state elicited from Raffin testimony that if blood with a PGM type of 2+, 1+, mixed with blood with a PGM type of 1+, a PGM test would show that the mixed blood had a PGM type of 2+, 1+. Raffin explained that this result, called "masking," occurs because blood with a PGM type of 2+, 1+, already contains a PGM component of 1+ and, therefore, the test would not be able to distinguish the blood with a PGM type of 1+ once it mixed with blood with a PGM type of 2+, 1+. Raffin testified that for blood with a PGM type of 2+, 1+, to mask blood with a PGM type of 1+, it was irrelevant which of the blood types was the major or minor contributor to the mixture.

During cross-examination, Raffin testified that, because there are only ten types of PGM, PGM tests cannot narrowly identify particular individuals as the source of blood samples. She also testified that DNA testing is far more specific with regard to isolating the source of a sample to a small class of individuals. She further testified that PGM tests are unable to detect a blood mixture in a sample whereas a DNA test likely would detect one. On redirect, Raffin stated that the ability of a DNA test to detect a mixture depended on the amount of each contributing blood type in the bloodstain and, further, on the number of white blood cells that is present in the mixture because DNA is found in white blood cells.

The state also offered the expert testimony of Michael T. Bourke, a criminalist for the state police forensic laboratory, who testified generally about DNA and the results of DNA tests that he had conducted on the various blood samples. We previously explained the basic theory of DNA testing in *State* v. *Hammond*, supra, 221 Conn. 281–82, which was consistent with Bourke's testimony. "DNA, the fundamental genetic material of all animals and plants, is composed of two parallel chain-like structures, each segment of which is a pair of chemical bases. The sequence of the base pairs determines each individual's genetic traits. Most DNA does not vary from person to person, but certain parts of the DNA, called 'polymorphic loci,' vary distinctly from one person to another." Id., 281.

Bourke also testified regarding the procedures the forensic laboratory staff followed to arrive at a conclusion concerning identification of blood contained in the blood samples. He explained that after extracting DNA from crime scene samples and samples taken from known individuals, profiles of the DNA found in those samples were compiled and then compared with each other to determine whether a match existed.

Bourke used a technique termed polymerase chain reaction (PCR) to determine the DNA profiles of the blood samples from the crime scene, the defendant, Gonzalez, Rosado and Santiago. He performed three different PCR tests: the DQ Alpha, the Poly Marker, and the D1S80. Bourke stated that a sample from the blood found on the defendant's jeans had a DNA profile that was consistent with the DNA profile of Santiago. He testified that one in five million people have the same DNA profile as Santiago. He also testified that the DNA profiles of the samples taken from the blood found inside and on top of the kitchen sink and on the kitchen floor was consistent with Rosado's DNA profile. Bourke stated that less than one in five million people have the same DNA profile as Rosado.

Bourke testified that, in order for a mixture of blood to exist in a sample and not be detected by DNA testing, the minor blood contributor would have to be less than approximately 10 percent of the total blood mixture. With regard to the blood samples taken from the kitchen sink that had a DNA profile that was consistent with Rosado's, Bourke testified that he had observed no evidence of a blood mixture. Bourke further testified, however, that although DNA testing has been documented to detect blood mixtures in samples where the ratio of the minor blood contributor to the major blood contributor was 1 to 20 and 1 to 100, those samples came from uncontaminated, freshly drawn blood and not field samples such as crime scene samples. Bourke added that, to his knowledge, there were no empirical studies concerning the ability of a DNA test to detect blood mixtures in field samples. The defendant elicited from Bourke that he had compared only the DNA profiles of the crime scene blood samples with the DNA profiles of the defendant, Gonzalez, Rosado and Santiago. Bourke added that he was unable to test whether the crime scene samples were consistent with the DNA profile of

a fifth unidentified person because he was not provided with a sample of that person's blood.

The defendant offered the expert testimony of Nora Rudin, a forensic DNA consultant, to testify generally concerning PGM and DNA testing and to discuss her conclusions regarding her analysis of the PGM and DNA tests conducted by Raffin and Bourke. Rudin testified that the combined results of the state's DNA and PGM testing, which showed that the samples taken from the kitchen sink and floor had a PGM type that matched the defendant's and a DNA profile that matched Rosado's, did not indicate that a blood mixture was present and, therefore, the blood in Santiago's kitchen most likely came from a fifth, unidentified person.[5] Rudin testified that, in order for a mixture to be present in a blood sample and simultaneously not be detectable by the DNA tests, the minor blood contributor would have to be present in an amount less than the sensitivity of the DNA tests. Rudin testified that in order for a DNA test to be unable to detect a minor blood contributor, the ratio of the minor contributor to the major contributor would have to be 1 to 150. In contrast to Raffin's testimony, Rudin testified that in order for blood with a PGM type of 2+, 1+, to mask blood with a PGM type of 1+, the two blood types would have to be in approximately equal proportions. Rudin testified that she concluded, therefore, that: (1) because the defendant's blood would have to be in equal proportions to Rosado's blood to mask Rosado's PGM type; and (2) if these proportions were present, the DNA tests would have been able to detect the defendant's blood; the test results showing a PGM type of 2+, 1+, and a DNA profile

---

[5] Rudin had prepared a report for the defendant based on her findings that stated: "Three other bloodstains . . . found in and around the kitchen sink and floor, appear to be from an individual whose reference sample was not tested in this analysis. It is more likely that this unidentified individual is a relative of the victim . . . ." The state submitted this report into evidence.

that matched Rosado's actually *excluded* the defendant, Rosado, Gonzalez and Santiago as possible sources of the blood found in the kitchen.

On cross-examination, Rudin testified that the ratios concerning DNA detection and PGM masking that she had earlier cited were based upon pristine, laboratory studies and not field samples. She stated that it was impossible to conduct empirical studies with field samples, such as a crime scene sample, because researchers need to know the precise proportions of blood present in the mixture in order to gather statistical information. Rudin also testified that heat, sunlight, humidity, chemicals and water dilution could degrade the DNA present in a blood sample and the ability of a DNA test to detect it. The state also elicited from Rudin that she had never visited the crime scene in this case nor reviewed any crime scene photographs. She testified further that her testimony was based on summaries that she had read, that she was not aware of all the evidence, and that she had no experience in the area of homicide investigations.

During its closing argument to the jury, the state proffered an explanation for the DNA and PGM test results. The state argued that the defendant had cut his hands during his attack on Gonzalez and Santiago and had come into contact with Rosado's blood after he had beaten and strangled Rosado to death. Thereafter, the state argued, the defendant had entered the kitchen and washed his hands, leaving droplets of a water diluted blood mixture consisting of his and Rosado's blood at the scene. The state claimed that the defendant's PGM type, which is found in the red blood cells, masked Rosado's PGM type. The state reminded the jurors that the ratio of red blood cells to white blood cells is 1000 to 1, and that red blood cells, therefore, are more likely to be found than white blood cells. In this mixture, the state argued, the amount of the

defendant's red blood cells present in the mixture was sufficient to mask Rosado's PGM type, but the amount of the defendant's white blood cells was below the sensitivity of the DNA tests. The state argued that the jury should not be persuaded by the defendant's theory that an unknown, fifth person was the perpetrator.

Several days after the jury returned its verdict, the defendant moved for a new trial on the ground, inter alia, that based on the DNA and PGM test results, it was impossible for the defendant to have been the perpetrator and, therefore, the jury verdict was improper as it was contrary to the scientific evidence. The defendant also argued that the state had known that the test results collectively were exculpatory to the defendant and that they had shown no evidence of a blood mixture. The trial court denied the defendant's motion.

Relying on *State* v. *Hammond,* supra, 221 Conn. 264, the defendant claims that the trial court abused its discretion by denying his motion for a new trial because the state's argument to the jury that the blood samples taken from Santiago's kitchen were inculpatory to the defendant was based on an impossible theory. Although the defendant did not object to the state's argument during or immediately after the argument, he maintains that his claim is preserved for review by his postverdict motion for a new trial. Alternatively, the defendant seeks review of this claim under *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[6]

---

[6] Under *Golding,* "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding,* supra, 213 Conn. 239–40.

The defendant's postverdict motion for a new trial did not adequately preserve this claim. The appropriate time for a defendant to raise a claim of impropriety in the state's final argument is either at the time the improper argument is made or at the close of the state's argument, not in a postverdict motion.[7] See *State* v. *Nieves*, 36 Conn. App. 546, 554, 653 A.2d 197, cert. denied, 232 Conn. 916, 655 A.2d 260 (1995); see also *State* v. *Chace*, 199 Conn. 102, 108, 505 A.2d 712 (1986). Therefore, his claim was not preserved properly.

We review the defendant's claim under *Golding*, however, because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Hammond*, supra, 221 Conn. 288–89 (reviewing defendant's claim that ruling of trial court violated his right to fair trial under *Golding*). The defendant's claim fails under *Golding*'s third prong, however, because we conclude that the state did not improperly argue its theory regarding the DNA and PGM test results to the jury.

The defendant claims that this case is similar to *State* v. *Hammond*, supra, 221 Conn. 264,[8] in that an analysis

---

[7] We note that the defendant raised several other objections to the state's argument and moved for a mistrial on those grounds immediately following the state's closing argument to the jury. The defendant did not raise his current claim, however, until his postverdict motion for a new trial.

[8] In *State* v. *Hammond*, supra, 221 Conn. 267, the defendant claimed that the trial court improperly denied his motion to set aside the verdict and for a new trial. At trial, the defendant had presented undisputed evidence that, based on uncontroverted blood typing and DNA tests performed on samples taken from the victim's clothing, it was a physical impossibility that the defendant was the man who had sexually assaulted the victim. Id., 279. We concluded that "[i]f indeed the state's theory was based on physically impossible facts and conclusions . . . then the defendant's motion for a new trial should have been granted. This exculpatory evidence raises a serious question whether the jury could reasonably have concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) Id., 286–87. Accordingly, we remanded the case to the trial court to reconsider its decision to deny the defendant's motion. Id., 289.

of the DNA and PGM test results regarding the blood samples taken from the kitchen established that it was impossible for a mixture of the defendant and Rosado's blood to have been present in the samples. The defendant argues that Rudin's testimony was undisputed that in order for blood with a PGM type of 2+, 1+, to mask blood with a PGM type of 1+, the blood needed to be in approximately equal proportions. The defendant also contends that Bourke testified that if the blood sample consisted of a blood mixture that had a ratio of 1 to 1, the DNA tests would have been able to detect both of the contributors of the blood. The defendant claims that he offered evidence that DNA tests were capable of detecting mixtures where the ratio of the contributing blood was 100 to 1. The defendant claims that it is scientifically impossible for him to have been a contributing source of the blood samples taken from Santiago's kitchen because if he had been a source, his DNA would have been detected in those samples. Because his DNA was not detected in the samples, the defendant claims, he could not have been a contributor to those samples.[9]

---

[9] The defendant also contends that testimony elicited from Henry C. Lee, the state's chief criminalist and the director of the state police forensic science laboratory, during an offer of proof proves that "a mixture [could not] possibly be the explanation for the test results." The defendant makes this contention based on Lee's testimony outside the presence of the jury that: (1) the bloodstains found in Santiago's kitchen could have come from a fifth unidentified person; (2) Lee could not exclude, scientifically, the possibility that the bloodstains did not come from a fifth person; (3) DNA tests can detect a minority contributor in a blood mixture where it contributes 10 to 20 percent of the mixture; and (4) PGM tests can detect a minority contributor in a blood mixture where it contributes 5 to 10 percent of the mixture.

Lee also testified, however, that many factors could affect the presence of red and white blood cells in a blood sample. Lee testified, for example, that exercise increases the number of red blood cells a person has in his blood. He also testified that the ratio of red blood cells to white blood cells differs depending on where a person's body is cut. He also stated that if someone washed his hands, the person could wash some of the white or red blood cells from the sample. Lee further testified that detergents and contamination could affect the ability of DNA and PGM tests to detect blood mixtures. He testified that Santiago's kitchen sink and floor were very dirty.

The defendant claims that he is entitled to a new trial because the state deprived him of a fair trial by arguing a theory of the case that was premised on scientifically impossible facts and conclusions. In the alternative, the defendant asks that we remand the case to the trial court to reconsider his motion for a new trial in light of the "fact" that the DNA and PGM test results of the kitchen samples exculpated him.

The state contends that the defendant's claim is unpreserved and, further, that the defendant cannot satisfy the requirements of *State* v. *Golding,* supra, 213 Conn. 239–40, because the state's argument was not improper. The state argues that it fairly and forcefully argued its case based upon the facts in evidence and the reasonable inferences drawn therefrom. The state also claims that this case is distinguishable from *Hammond* because its argument to the jury was not based on impossible facts and because the expert testimony in this case was disputed. In the alternative, the state

He also stated that the studies concerning DNA and PGM test detection were conducted with fresh blood in sanitary conditions and, therefore, were not entirely analogous to crime scene samples. Although Lee concluded that the stains might have come from a fifth person, he also stated that, based on his experience, the more logical conclusion was that the blood found in Santiago's kitchen was a mixture. We, therefore, disagree with the defendant's contention that Lee's testimony proves that "a mixture [could not] possibly be the explanation for the test results."

Furthermore, testimony given during an offer of proof for the purpose of showing the trial court the content of a witness' testimony, rather than to preserve for an appeal the adverse ruling of the trial court concerning the admissibility of evidence, is not substantive evidence. See Practice Book § 67-1 ("[t]he evidence referred to in the brief . . . will be deemed to embrace all testimony *produced at the trial*" [emphasis added]); *State* v. *Conrod,* 198 Conn. 592, 597, 504 A.2d 494 (1986); see also C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 3.5.5 (b), pp. 53–54; 1 C. McCormick, Evidence (5th Ed. 1999) § 51, pp. 216–17. The trial court ordered the offer of proof to give the defendant a preview of Lee's testimony in light of the state's prior assertions that it did not intend to call Lee as a witness. The defendant, therefore, should not have relied on Lee's testimony during the state's offer of proof to support his claim.

argues that, even if we were to conclude that it was scientifically impossible for the defendant to have been the source of the blood samples taken from the kitchen, a new trial is not warranted because the jury did not need to conclude that the defendant was the source of the blood samples in order to return a guilty verdict against the defendant.

Our analysis of the trial court's ruling on the defendant's motion for a new trial begins with our well established standard of review. "Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a new trial], we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *McIntyre*, 250 Conn. 526, 533, 737 A.2d 392 (1999).

"One cogent reason for overturning the verdict of a jury is that the verdict is based on conclusions that are physically impossible. [A] verdict should be set aside [w]here testimony is thus in conflict with indisputable physical facts, the facts demonstrate that the testimony is either intentionally or unintentionally untrue, and leave no real question of conflict of evidence for the jury concerning which reasonable minds could reasonably differ." (Internal quotation marks omitted.) *State* v. *Hammond,* supra, 221 Conn. 268.

As we have indicated; see footnote 8 of this opinion; in *Hammond* it was undisputed, based on uncontroverted blood-typing and DNA evidence, that it was physically impossible for the defendant to have committed the sexual assault in question. Unlike in *Hammond*, however, the trial court in this case was not confronted with uncontroverted evidence that precluded the jury from convicting the defendant on the charges against him.

The defendant's argument rests entirely on his claim that Rudin's testimony—that in order for blood with a PGM type of 2+, 1+, to mask blood with a PGM type of 1+, the blood needs to be approximately in equal proportions—was undisputed. Our review of the record shows, however, that Rudin's testimony was not undisputed. Several times during her testimony, Raffin testified that blood with a PGM type of 2+, 1+, would *always* mask blood with a PGM type of 1+, regardless of the proportion of the blood types in the sample.

Furthermore, there are other explanations, supported by the expert testimony, as to why the defendant's DNA was not found in the blood samples from Santiago's kitchen. Given that the ratio of red blood cells to white blood cells is typically 1000 to 1, the blood samples taken from the kitchen could have contained a mixture where the presence of the defendant's red blood cells was sufficient to be detected by the PGM tests, but his white blood cells were insufficient to be detected by the DNA tests. Moreover, Rudin testified that heat, sunlight, humidity, chemicals and water dilution could degrade DNA that is present in a blood sample and, therefore, affect the ability of a DNA test to detect it. This testimony is particularly pertinent because the blood samples in question were taken from the kitchen sink and floor, where the perpetrator reasonably could have washed his hands, subjecting the bloodstains to water dilution and contamination. There also was testimony

from Rudin and Bourke that the empirical studies, reporting that DNA tests are capable of detecting a minor blood contributor of a blood mixture at a ratio of 1 to 150, were conducted with fresh, uncontaminated blood rather than blood found at a crime scene. We conclude, therefore, that the trial court was not presented with a case where the verdict of the jury was "based on conclusions that are [scientifically] impossible." *State* v. *Hammond*, supra, 221 Conn. 268; see also *State* v. *Ortiz*, 252 Conn. 533, 571–72, 747 A.2d 487 (2000); *State* v. *Sherman*, 38 Conn. App. 371, 420, 662 A.2d 767, cert. denied, 235 Conn. 905, 665 A.2d 905 (1995). Accordingly, we conclude that the trial court did not abuse its discretion by refusing to grant the defendant a new trial on this ground.

B

The following facts are necessary for our resolution of the defendant's second claim with regard to the trial court's denial of his motion for a new trial. At trial, the state questioned Bourke about the procedures he followed to ensure that he properly had conducted the DNA tests. Bourke testified that he had complied with the DNA test protocols and that Carol A. Sherzinger, a criminalist in the state forensic laboratory, had reviewed and signed Bourke's report, which contained an analysis of the DNA profiles, as a secondary examiner.[10] Bourke testified that once Sherzinger had completed her review of the report, it was sent to Carl Ladd, the head of the DNA unit of the state forensic laboratory, who conducted a technical review of the report. Thereafter, the report was sent to Debbie Messina, the super-

---

[10] Bourke testified that all cases within the forensic laboratory are assigned to a primary and secondary examiner. Bourke further testified that a secondary examiner would sign a report compiled by a primary examiner only after he or she had conducted a complete review of the report and had agreed with the primary examiner that all of the conclusions and the analysis within the report were correct.

vising criminalist for the state forensic laboratory, who conducted an administrative review of the report.

Rudin testified that during the administration of a DNA test, part of DNA test protocol is to conduct a "control." She explained that a control is a procedure in which a known blood sample is put through the DNA test at exactly the same time as the unknown blood samples. The purpose of this procedure is to ensure that the DNA test is reporting its results accurately, which is indicated by the control properly reporting its known blood type. If the control does not properly report its known blood type, the results derived from the unknown blood samples are considered inconclusive.

Rudin testified that the state conducted two DNA tests on the bloodstain found on the defendant's jeans, the DQ Alpha and the Poly Marker. Whether the control properly reported its known blood type is indicated on the DQ Alpha test by a dot called the C dot, and is indicated on the Poly Marker test by a dot called the S dot. Rudin testified that after reviewing a photograph of the DQ Alpha data concerning the sample taken from the defendant's jeans, she noticed that the C dot did not appear. She testified that a mixture of different blood types could explain why the C dot did not appear. She further testified that although the C dot was not present, Santiago still could not be excluded as the source of the bloodstain.

On cross-examination, the state elicited from Rudin that, earlier that same day, she had testified that she had found no defect in the forensic laboratory's conclusion that the genetic profile of the bloodstain from the defendant's jeans was consistent with Santiago's, and that she had noted no defect in her report. Rudin testified that it was not until the court took a recess that afternoon that she was able to review for the first time

an actual photograph of the data, which, she explained, was why she was unable to notice prior to her testimony that the C dot was not present.[11]

During its closing argument, the state argued that the blood on the defendant's jeans belonged to Santiago. Following the verdict, the defendant moved for a new trial on the ground that the state had withheld from the defendant the fact that the C dot did not appear on the DQ Alpha test results. The trial court disagreed with the defendant's claim, finding that the state had disclosed photographs of the DNA test results to the defendant, and that the defendant had sufficient time to show them to his expert. Further, the court stated that the defendant's expert, in fact, had reviewed the photographs and had testified regarding her findings with respect to the C dot and the state forensic laboratory's conclusions. The court therefore found no reason to grant the defendant's motion on that ground.

The defendant now claims that the trial court improperly denied his motion for a new trial because the state's improper argument to the jury that Santiago's blood was found on the defendant's jeans violated his right to a fair trial. The defendant contends that he is entitled to a new trial because Rudin's undisputed testimony established that the DNA test conducted on the defendant's jeans was inconclusive and unreliable. The defendant maintains that he preserved this claim for appellate review during his postverdict motion for a new trial and that, alternatively, this claim is reviewable under *Golding*. See footnote 6 of this opinion.

The state argues that this claim is unpreserved because the defendant did not make this particular claim before the trial court. The state claims that the defendant's postverdict motion for a new trial focused

---

[11] Rudin testified that she originally had reviewed a photocopy of the photograph that did not clearly show whether a C dot was present.

on the state's alleged withholding of information concerning the C dot, not on any impropriety in the state's argument. The state also contends that the defendant cannot satisfy the third prong of *Golding*. Further, the state argues, the jury did not have to believe Rudin's testimony that the results of the DNA tests were inconclusive because: (1) she originally had testified that the results were valid; and (2) Bourke had testified that he followed the appropriate test protocols. We agree with the state.

As set forth in part I A of this opinion, our review of the record reveals that the defendant failed to object to the state's remarks immediately after the conclusion of its argument to the jury and, therefore, did not preserve this claim for review. *State* v. *Nieves*, supra, 36 Conn. App. 554. Even if we were to agree with the defendant that he properly could preserve such a claim for review by filing a postverdict motion for a new trial, he never raised this specific claim about the state's final argument in that motion.

We review the defendant's claim under *Golding*, however, because the record is adequate for review and the claim—that he was denied a fair trial—is of constitutional magnitude. See *State* v. *Hammond*, supra, 221 Conn. 288–89. The defendant's claim fails under *Golding*'s third prong, however, because we conclude that the state's argument to the jury that Santiago's blood was found on the defendant's jeans was not improper.

When making closing arguments to the jury, "[c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . *State* v. *Andrews*, 248 Conn. 1, 19, 726 A.2d 104 (1999). Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [pro-

vided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. *State* v. *Bova*, 240 Conn. 210, 243, 690 A.2d 1370 (1997)." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 249, 745 A.2d 800 (2000). The state did not exceed these boundaries in this case.

Bourke testified that he had followed the standard protocol for DNA testing. Further, he testified that three other scientists had reviewed his report, including Sherzinger, whose signature as a secondary examiner confirmed that Bourke had conducted the tests properly. Moreover, Rudin's testimony did not unequivocally state that Santiago's blood was not found on the defendant's jeans. Rudin, who originally testified that Bourke had properly conducted the DNA tests, testified that even without the C dot, she could not exclude Santiago as the source of the bloodstain. Furthermore, Rudin's testimony challenged only the results of the DQ Alpha test; she never testified that the S dot on the Poly Marker DNA test did not appear nor did she question the results of the PGM testing of the jeans, which showed the presence of blood with the same PGM type as Santiago's. We conclude that the presence of Santiago's blood on the defendant's jeans was a disputed issue and, therefore, the state's closing argument that Santiago's blood was present on the jeans was not improper because it was fairly based upon facts in evidence and reasonable inferences that could be drawn therefrom. See id. Accordingly, we conclude that the trial court did not abuse its discretion by refusing to grant the defendant a new trial.

II

The defendant next claims that the trial court improperly denied his motion for a mistrial. Specifically, the defendant argues that the trial court should have declared a mistrial after the jury had heard part of the

direct testimony of the state's expert witness, Henry C. Lee, which the trial court struck from the record after Lee became unavailable to continue his testimony. We disagree.

The following facts are relevant to our resolution of this claim. During its case-in-chief, the state called Lee, the state's chief criminalist and the director of the state police forensic science laboratory. Lee testified regarding his experience and training in the areas of forensic science, serology, and PGM and DNA analysis, after which the court granted the state's request that Lee be qualified to give his testimony as an expert in those areas. Thereafter, Lee testified that he had reviewed the work sheets and reports of Raffin regarding her serological and PGM analysis of the samples taken from the bloodstains found in Santiago's kitchen, and also the reports of Bourke regarding his DNA analysis of those same samples.

Lee explained to the jury the basic differences between ABO blood-typing, PGM enzyme analysis and DNA analysis, confirming the testimony that Raffin and Bourke had given previously. He also testified about the differences between blood samples taken from a crime scene and those that are developed within a laboratory. Lee explained that laboratory samples are controlled samples, on which research is generally based, consisting of fresh, uncontaminated blood that is procured in sterilized laboratories. He testified that crime scene samples, on the other hand, are procured from unclean and unsterilized environments. Lee explained that such environments can cause the blood contained in crime scene samples to generate results that are sometimes unpredictable and difficult to explain. He further testified that several "subsequent effect factor[s]," such as rain, heat, sunshine, running tap water, detergents, or the improper transfer of a sample by an officer can also affect blood samples in ways that can

produce unpredictable outcomes. Lee explained that these preexisting and subsequent conditions can, for example, dilute the amount of red and white blood cells contained within a bloodstain or cause the cells to burst, making it difficult for DNA and PGM tests to read properly.

When the state attempted to elicit from Lee his opinion regarding the DNA and PGM test results of the blood samples taken from Santiago's kitchen, the defendant objected. Outside the presence of the jury, the defendant claimed that the state's direct examination of Lee had exceeded the scope of testimony the state had elicited previously from Lee during an offer of proof. See footnote 9 of this opinion. The trial court did not rule on the defendant's objection and, thereafter, took an afternoon recess. After the recess, the defendant refused to return to the courtroom from the courthouse lockup. After a brief discussion with counsel concerning this issue, the trial court decided to adjourn for the day.

The following day, outside the presence of the jury, the state indicated to the court that Lee would not be available for the entire day and perhaps for the rest of the trial. The trial court, finding that the defendant would not have sufficient time to cross-examine Lee, ruled that it would strike Lee's testimony. Thereafter, the defendant moved for a mistrial because the jury had heard Lee's testimony regarding PGM and DNA analysis. The court denied the motion, finding that Lee had not testified regarding his opinion and had only explained the differences between white and red blood cells. Subsequently, the trial court instructed the jury as follows: "I instruct you that the testimony of Dr. Henry C. Lee is being stricken from the record and you are instructed to disregard it completely. The reason that it's being stricken is because Dr. Lee is unavailable and could not continue his testimony."

During its final instructions, the trial court charged the jury as follows: "Testimony that has been excluded or stricken is not evidence. You are to consider only such evidence as was admitted and if some evidence was given but stricken from the record, or if some evidence was offered and refused, you must not consider it and you must dismiss it from your minds. In this regard I remind you that the court ordered the testimony of Dr. Henry Lee stricken from the record. And you are not to consider his testimony at all in deciding your verdict in this case . . . . You are to decide the case solely on the evidence received in the trial."

Following the jury's verdict, the defendant moved for a new trial arguing that, although the court had struck Lee's testimony from the record, Lee had given several opinions regarding the effects of contamination and dilution on PGM and DNA test results. The defendant claimed that Lee's partial testimony had denied him a fair trial. The trial court determined, however, that it had struck Lee's testimony, that it had instructed the jury to disregard Lee's testimony on two occasions, and that Lee's testimony did not include his opinion concerning the PGM and DNA results. The court therefore declined to grant the defendant a new trial.

The defendant claims that the trial court improperly denied his motion for a mistrial because the jury could have inferred that the state called Lee because his testimony was going to favor the state's case. The defendant contends that the trial court's curative instructions were not sufficient to overcome the prejudicial impact of Lee's partial testimony in light of his reputation and celebrity. The defendant claims, therefore, that he is entitled to a new trial.

The state counters that the jury's exposure to Lee's stricken testimony had no effect on the outcome of its

verdict because Lee never gave an opinion concerning the PGM and DNA tests. The state also claims that Lee's testimony was not necessary to its case in light of the substantial evidence that implicated the defendant as the perpetrator of the crimes charged. The state further claims that the trial court's curative instructions eliminated any possible prejudice to the defendant. The state argues, therefore, that the trial court did not abuse its discretion by denying the defendant's motion for a mistrial. Moreover, the state contends that, without any indication to the contrary, on appeal this court must presume that the jury followed the instructions of the trial court. We agree with the state.

The principles that govern our review of a trial court's ruling on a motion for a mistrial are well established. "Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. *State* v. *Hammond*, [supra, 221 Conn. 269]. Thus, [a] motion for a [mistrial] is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion. . . . *State* v. *Newsome*, 238 Conn. 588, 628–29, 682 A.2d 972 (1996)." (Internal quotation marks omitted.) *State* v. *McIntyre*, supra, 250 Conn. 533. Therefore, we must determine whether Lee's stricken, partial testimony was so prejudicial that it deprived the defendant of a fair trial. Furthermore, even if we were to assume that Lee's testimony, in light of his celebrity, fairly could be seen as prejudicial, we must also decide whether

the trial court's curative instructions remedied any prejudice that might have occurred.

We conclude that Lee's testimony, despite his celebrity status, was not so prejudicial as to amount to a denial of the defendant's right to a fair trial. As the trial court articulated, Lee never gave his opinion regarding the PGM and DNA test results; he merely explained in general terms the differences between serology, PGM and DNA testing, white and red blood cells, and controlled and field samples.

Moreover, "[i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions." *State* v. *Velasco*, 253 Conn. 210, 246, 751 A.2d 800 (2000); see *State* v. *McIntyre*, supra, 250 Conn. 533; *State* v. *Austin*, 244 Conn. 226, 242, 710 A.2d 732 (1998); *State* v. *Correa*, 241 Conn. 322, 353, 696 A.2d 944 (1997); *State* v. *Raguseo*, 225 Conn. 114, 131, 622 A.2d 519 (1993). "[T]he burden is on the defendant to establish that, in the context of the proceedings as a whole, the stricken testimony was so prejudicial, notwithstanding the court's curative instructions, that the jury reasonably cannot be presumed to have disregarded it." *State* v. *McIntyre*, supra, 534. The defendant in the present case has not met this burden.

We recognize that Lee may be considered a celebrity by some people because of his participation in many high profile criminal cases. The trial court, however, specifically instructed the jury on two occasions to disregard Lee's testimony in its entirety. Our review of the record reveals nothing that indicates that Lee's notoriety blinded the jury from deciding this case properly. More importantly, there is nothing in the record that demonstrates that the jury disregarded the trial court's instructions to ignore Lee's testimony when it was deliberating. We conclude, therefore, that the trial

court did not abuse its discretion by denying the defendant's motion for a mistrial.

## III

The defendant also claims that the state's attorney who tried the case repeatedly made improper arguments to the jury that were so egregious and prejudicial to his case that it resulted in a violation of his constitutional right to a fair trial before an impartial jury. Specifically, the defendant argues that, during the state's closing argument to the jury, the state's attorney improperly: (1) vouched for the credibility of three of the state's witnesses; (2) "attack[ed]" Rudin's credibility and testimony; (3) commented on the law concerning consciousness of guilt and the defendant's actions that demonstrated a consciousness of guilt after the trial court had ruled that it would not give instructions on that law; (4) expressed his personal opinion regarding the defendant's guilt; (5) suggested to the jurors that as members of the community they had a duty to convict the defendant in order to protect the future of the community; (6) "attacked" the defendant and his counsel; (7) expressed his personal opinion regarding the case; (8) asked the jury to listen to what he was saying taking into consideration his experience as a prosecutor; (9) "testified" to the jury regarding certain events that surrounded Santiago's identification of the defendant; (10) "testified" to the jury concerning Santiago's identification of the defendant during the probable cause hearing; and (11) argued that the fact that the defendant had cuts and his own blood on his hands when Waterbury police apprehended him meant that he was guilty. We do not agree that the state's attorney's argument violated the defendant's right to a fair trial.

The following facts are relevant to our resolution of these claims. Prior to closing argument, the trial court granted the defendant's motion to limit the state's final

argument to the jury, which motion essentially had requested that the trial court order the state to refrain from making improper comments. After the state concluded its closing argument, the defendant moved for a mistrial claiming that the state had violated the court's order by: (1) referring to facts that were not in evidence by mentioning Rudin's report, stating that Rudin's testimony was contrived by the defense, and commenting on the circumstances that surrounded Santiago's identification of the defendant during the probable cause hearing; (2) personally attacking Rudin by referring to her as "Ms. Rudin" instead of "Dr. Rudin," and stating that Rudin was not a PGM expert despite her qualification as such; (3) improperly characterizing the defendant's defense and the conduct of the defendant's counsel; (4) stating that the defendant was guilty based on overwhelming evidence; and (5) referring to the jury as "members of the community . . . ." The defendant also claimed that the state's attorney had tried to distract the jury by "bang[ing] his leg continually" during the defendant's closing argument.

Although the trial court found that some of the state's comments were objectionable, when viewed in the context of the closing argument as a whole, the court determined that the impropriety did not rise to a level requiring a mistrial.[12] The court therefore denied the defendant's motion. The trial court offered to give the jury a curative instruction, however, and asked the defendant to file a proposed curative instruction. Thereafter, the trial court instructed the jury with respect to the state's comments based upon the curative instruction the defendant had submitted.[13] The trial court

---

[12] The trial court reminded the defendant that the state had admitted Rudin's report into evidence and, therefore, references to the report were not improper.

[13] The trial court instructed the jury as follows: "Certain things are not evidence and you may not consider them in deciding what the facts are. These include . . . the arguments and statements [made] by the lawyers. . . . The lawyers are not witnesses. What they have said in their closing

instructed the jury to disregard: (1) the state's attorney's comments that, based upon his college degree in biology, Rudin was not credible; (2) the state's attorney's assertions that the defendant was guilty beyond all doubt; (3) the state's attorney's statements concerning

arguments and at other times is intended to help you interpret the evidence, but it is not evidence. You should not consider as evidence their recollections of the evidence, nor their personal belief as to any facts or as to the credibility of any witness, nor any facts which any attorney may have presented to you in argument from that attorney's knowledge which was not presented to you as evidence during the course of the trial.

"Now . . . you heard closing arguments from both the prosecution and the defense. The state's attorney asserted then that he had a biology degree and/or background and that based upon said knowledge and experience, that the defendant's expert, Dr. Nora Rudin, was not credible. You must disregard those comments completely. . . .

"Now, during the course of closing argument, the state's attorney indicated that the defendant was guilty beyond all doubt. I must instruct you that you are to disregard that comment and draw no inference from the prosecutor's statements as to guilt. . . . [Y]ou are the triers of the facts in this case, and you must determine if the evidence presented during the course of the trial establishes the defendant's guilt or nonguilt. The opinion and belief of the prosecutor . . . must have no bearing on your deliberations. It is your job to examine the evidence and to determine if the state has proven each and every element of the crimes for which the defendant is on trial. . . .

"During the course of closing argument the state's attorney inappropriately expressed certain personal beliefs as to the evidence adduced at trial. You are to draw no inferences from any statements made by the prosecutor as to his personal beliefs and opinions. In considering the evidence in the case before you, you may use your own common sense, logic and experience. Any beliefs and opinions expressed by counsel should have no bearing on your deliberations. As the trier of fact, you and you alone must determine the credibility of witnesses and the weight to be given to the evidence.

"During the course of closing argument the prosecutor indicated that you as jurors represent the community and that in making your decision you should consider your community when deliberating. However, the prosecutor was mistaken. You are not to consider that at all. You as jurors represent the community only in the fact that you are asked to discharge your duty as citizens. As jurors you do represent the community in that . . . in our system we ask every citizen to fulfill his duty to his community by serving as jurors when called upon. Furthermore, in doing so, you are asked to use your own logic, common sense and experience. However, you are to render your decision based only upon the evidence. If you find that the state has proved the defendant's guilt beyond a reasonable doubt, then you must find him guilty. However, if you find that the state has failed to prove the defendant guilty beyond a reasonable doubt, then you must find him not guilty."

his personal beliefs and opinions regarding evidence presented during the trial; and (4) the state's attorney's remark that the jury should consider the community when deliberating. Following the jury's verdict, the defendant moved for a new trial based on, inter alia, the numerous instances of alleged prosecutorial misconduct. The trial court denied the defendant a new trial and found that, although some of the comments by the state's attorney were improper, the jury was instructed to disregard those comments.

We previously have recognized that prosecutorial misconduct can occur in the course of closing argument. *State* v. *Atkinson*, 235 Conn. 748, 768–69, 670 A.2d 276 (1996). In analyzing claims of prosecutorial misconduct, however, we ask whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 539, 529 A.2d 653 (1987). The standard that we follow in analyzing constitutional due process claims that allege prosecutorial misconduct is the fairness of the trial rather than the culpability of the prosecutor's conduct. Id., 539–40.

" 'In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors.' [Id., 540]. Included among those factors are the extent to which the misconduct was invited by defense conduct or argument; *State* v. *Falcone*, 191 Conn. 12, 23, 463 A.2d 558 (1983); the severity of the misconduct; see *United States* v. *Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981), cert. denied, 456 U.S. 989, 102 S. Ct. 2269, 73 L. Ed. 2d 1284 (1982); the frequency of the misconduct; *State* v. *Couture*, 194 Conn. 530, 562–63, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); see *State* v. *Doehrer*, [200 Conn. 642, 654, 513

A.2d 58 (1986)]; *State* v. *Palmer*, [196 Conn. 157, 163, 491 A.2d 1075 (1985)]; the centrality of the misconduct to the critical issues in the case; *Hawthorne* v. *United States*, 476 A.2d 164, 172 (D.C. App. 1984); the strength of the curative measures adopted; *United States* v. *Modica*, supra, 1181; *Harris* v. *United States*, 402 F.2d 656, 657 n.1 (D.C. Cir. 1968); *State* v. *Doehrer*, supra, 654; and the strength of the state's case. See *United States* v. *Modica*, supra, 1181; *State* v. *Couture*, supra, 564; see also *State* v. *Glenn*, 194 Conn. 483, 492, 481 A.2d 741 (1984).

"The parameters of the term 'zealous advocacy' are also well settled. The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. *United States* v. *Modica*, supra, 663 F.2d 1179; *United States* v. *Drummond*, 481 F.2d 62 (2d Cir. 1973); 1 A.B.A., Standards for Criminal Justice (2d Ed. 1980) c. 3, standard 3-5.8 (b), p. 3.87. Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. *Harris* v. *United States*, supra, 402 F.2d 658; 1 A.B.A., supra, standard 3-5.8 (b), p. 3.87. Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. *State* v. *Ferrone*, [96 Conn. 160, 168–69, 113 A. 452 (1921)]. Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence; *United States* v. *Modica*, supra, 1178–79; it is likely to infer that such matters precipitated the personal opinions. Finally, in fulfilling his duties, the prosecutor must confine the arguments to the evidence in the record. *State* v. *Binet*, 192 Conn. 618, 631, 473 A.2d 1200 (1984); *State* v. *Ferrone*, supra, 169. Statements as to facts that have not been proven amount to unsworn testimony that is not the subject of proper closing argument. 1 A.B.A., supra,

standard 3-5.8 (a), p. 3.87." *State* v. *Satchwell*, 244 Conn. 547, 578–79, 710 A.2d 1348 (1998) (*Katz, J.*, concurring). With these principles in mind, we review the defendant's various claims of impropriety.

## A

### Preserved Claims of Prosecutorial Misconduct

### 1

### Expression of Personal Opinion

The defendant first claims that the state improperly vouched for the credibility of Santiago by stating that Santiago never wavered nor had difficulty identifying the defendant.[14] We disagree. When addressing the

---

[14] In its closing argument, the state's attorney argued: "[Santiago] never wavered, never once. Alphonso. She never wavered in her identification. But she was up here. You were up here for ten, twenty minutes. She was up here two full days. Pounded him. Physically exhausted. You saw. 'What socks did you have on? What [is] this? What [is] that? Don't fall for that.'
\* \* \*
"And put yourself in her shoes, put yourself in her place again. How many of you [having] gone through seeing this would be able to handle giving the police a statement? How many? I dare say not so many. . . . Then she said he smashes her over the head with, first, a radio and then the jar. Look [at] the photos. You'll see the peppers substance all over the floor. Is she right? 'Oh, what happened first? Did he hit you with the peppers? Which radio did he hit you [with] first, the green one, the red one?' Nonsense.
\* \* \*
"Do you think she'll ever forget his face or his eyes ever? She'll never forget. The day the fifty pound can of tomatoes fell on your foot, you may not remember what shoe you put on first, or sock you put on first, or what you had for breakfast. . . . Do you remember the fifty pound can of tomatoes falling on your foot? Things stand out in your mind. Just like I remember smashing the $2000 carbide tool. That stands out in my mind. Things stand out in your mind."
During his rebuttal argument, the state's attorney made the following remarks to the jury: "Now, you heard [defense counsel] saying that [Santiago] had a hard time or difficult time identifying [the defendant]. She never had a difficult time identifying [the defendant]. You saw her come into court . . . and say, 'That's him. There is no doubt that's him. I'm sure.' And it's exactly the same thing she did [during the probable cause hearing]. Do you think a judge of a Superior Court of Connecticut is going to allow me to go over, put my hand over somebody and then have the witness point out

defendant's motion for a mistrial, the trial court, in response to the defendant's claim that the state's attorney had improperly vouched for Santiago, stated: "The comments about the identification of [Santiago] was proper argument, that the evidence does reflect that she was certain in the identification [of the defendant] in the video, [in] the photo array and in court. And the jury can make that conclusion or not." We agree with the trial court that the state's comments regarding Santiago's identification of the defendant were proper because they were based on the evidence.

At trial, the state proffered testimony from Santiago, Sergeant Nardozzi and Murphy, Santiago's apartment superintendent, that Santiago immediately had identified the defendant upon seeing him on the surveillance videotape. The state also proffered the testimony of Sergeant Gray that Santiago had identified the defendant from a photographic array immediately upon seeing him. Also Santiago consistently identified the defendant as the perpetrator throughout her testimony at trial and during the probable cause hearing. We conclude, therefore, that the comments by the state's attorney were not improper.

The defendant also claims that the state deprived him of a fair trial by improperly ridiculing a defense witness in order to discredit her testimony. Specifically, the defendant contends that during closing argument, the state improperly: (1) refused to refer to the defendant's expert as "Dr. Rudin" and instead called her "Ms. Rudin"; (2) asserted that Rudin was not a PGM expert, despite the trial court having accepted her as such; and (3) argued that Rudin and the defendant's attorney, who was female, contrived Rudin's testimony that the DNA

. . . 'That's him.' And the judge said [to me] 'Take a walk, go over [to the defense table] and put your hand over [the person Santiago is identifying]. I want to see who she's pointing out.' She didn't ever have no problem. That's how that happened."

tests conducted on the defendant's jeans were unreliable when they both went into a women's bathroom during a brief recess.[15]

The state's attorney's comments in these respects were clearly improper. The trial court accepted Rudin as an expert in DNA and genetic marker analysis, which includes PGM testing. The state, therefore, improperly argued that Rudin was not a PGM expert. Further, the state's attorney's insistence on referring to Rudin as "Ms. Rudin" or "Mrs. Rudin" improperly expressed the state's attorney's personal opinion concerning Rudin's credibility as an expert. See *State* v. *Williams*, supra, 204 Conn. 541. We also conclude that there was no evidence that the defendant's attorney and Rudin fabricated Rudin's testimony during the court's brief

---

[15] The state's attorney argued to the jury: "Now Ms. Rudin, our expert, she didn't know the difference between a carbohydrate testing system of ABO and the PGM system. She had to admit she was wrong. She learned that from me. . . . I know the difference between a carbohydrate testing system and a protein testing system . . . . Ms. Rudin does not. . . . And in her report she says, 'Hey, that testing is fine.' It includes Ms. Santiago in those jeans on the DNA. . . . She testifies on direct, [then] on cross[-examination]. Now what happened [next]? We get a break. She goes down[-stairs] at the break with [defense counsel] into the bathroom and suddenly she's jumping back up here . . . . You saw the cross[-examination]." During its rebuttal argument, the state's attorney commented: "And remember Dr. Rudin. I don't call her Dr. Rudin, Mrs. Rudin. She's a paid for, hired consultant. . . . Ms. Rudin, she comes in here. She's not even a PGM expert. . . . In her report she says, 'Hey, these results [regarding Santiago's DNA and PGM on the defendant's jeans] are okay.' Then she goes in the bathroom. Then she comes back and . . . all of a sudden [she says] this [report] is no good. So don't go for that. You know Dr. Rudin or Mrs. Rudin, Ms. Rudin is a paid for, hired consultant."

Following closing arguments, the defendant objected to the state's attorney's refusal to refer to Rudin as "Dr. Rudin." The defendant also objected to the state's attorney's comments that Rudin was not a PGM expert, despite the trial court having qualified her as such. The trial court itself stated that the state's attorney's comments that Rudin and the defendant's attorney had concocted Rudin's testimony while in the women's bathroom were objectionable.

recess.[16] Nonetheless, because of the strength of the state's case, the state's attorney's improper comments did not rise to a level of seriousness as to amount to a denial of the defendant's right to due process. See *State* v. *Couture*, supra, 194 Conn. 564. The state proffered evidence that included: (1) the identification of the defendant as the perpetrator by two eyewitnesses, Santiago and Gonzalez; (2) the surveillance videotape showing the defendant entering the building on the day of the crimes; (3) the defendant's fingerprints and palm prints on certain items at the crime scene that implicated him as the perpetrator; (4) the defendant's actions after the incident, from which the jury reasonably could infer guilt; (5) testimony that the defendant's blood was found at the crime scene; (6) testimony that Santiago's blood was found on the defendant's clothing; and (7) the cuts on the defendant's hands, which corroborated Santiago's testimony that the defendant used glass objects to hit both Gonzalez and Rosado. We conclude, therefore, that in light of the strength of the state's case and the trial court's curative instructions admonishing the jury to ignore the state's attorney's personal comments; see footnote 13 of this opinion; the state's attorney's remarks, although improper, did not deprive the defendant of due process and his constitutional right to a fair trial.

2

Consciousness of Guilt Evidence

The defendant next claims that the state's attorney violated an order of the trial court by arguing certain evidence to the jury, thereby depriving him of a fair

---

[16] The defendant also argues that the state's attorney's argument that defense counsel and Rudin, both females, had fabricated Rudin's testimony in the bathroom improperly harbored gender stereotypes. The defendant has failed, however, to explain to this court exactly what those stereotypes are and, more importantly, how they have deprived him of a fair trial.

trial. Specifically, the defendant claims that, despite the trial court's prior ruling that it would not instruct the jury on the law concerning consciousness of guilt evidence, the state's attorney improperly argued to the jury that the defendant's behavior on the day of the crimes demonstrated that the defendant had a consciousness of guilt.

The following additional procedural history is relevant to our resolution of this claim. After the closing arguments, the defendant objected to the state's closing argument, claiming that the state's attorney violated the trial court's prior in-chambers ruling by referring to the law of consciousness of guilt.[17] The state responded that its understanding of the trial court's ruling was that it could argue the law of consciousness of guilt, but that the court would not give the jury an instruction on the law. The trial court disagreed, stating that the attorneys were allowed to argue the facts that demonstrated consciousness of guilt but were prohibited from arguing the legal principles of consciousness of guilt. The trial court, however, ruled that it would not give a curative instruction to the jury to disregard the state's attorney's comments regarding consciousness of guilt because an instruction might draw the jury's attention, once again, to the state's improper remarks. The defendant did not take exception to that ruling.

As noted previously, in considering claims of prosecutorial misconduct, we apply a due process analysis

---

[17] The state's attorney made three references to consciousness of guilt during its closing argument. First, he stated: "You heard what Paul Penders [the forensic photographer] said when he tried to take these pictures . . . and [from the] state police how [the defendant] acted. We have a word for that in Connecticut. It's called consciousness of guilt, admission by conduct." Thereafter, he stated: "Now, when the police come, where is [the defendant]? Hiding in the closet. Consciousness of guilt. Admission by conduct." Finally, the state's attorney commented: "And then look how [the defendant] acted when [the forensic photographer] went to take the pictures of [the defendant's] hand. Consciousness of guilt, admission by conduct. Where is [the defendant]? He's hiding in a closet."

and consider whether the defendant was deprived of a fair trial. See *State* v. *Williams*, supra, 204 Conn. 539–40. We apply a different standard, however, when the defendant's claim of misconduct involves "deliberate prosecutorial misconduct during trial which violates express trial court rulings . . . ." *State* v. *Ubaldi*, 190 Conn. 559, 570, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). In those cases, "[t]his court . . . has supervisory power to vacate a judgment of conviction and to order a new trial to deter prosecutorial misconduct which, while not so egregious as to deprive the defendant of a fair trial, is unduly offensive to the maintenance of a sound judicial process." (Internal quotation marks omitted.) *State* v. *Fullwood*, 194 Conn. 573, 584, 484 A.2d 435 (1984). In deciding whether the use of our supervisory powers to reverse a conviction is appropriate, we consider whether the effect of the challenged remark "was to undermine the authority of the trial court's ruling . . . ." *State* v. *Ubaldi*, supra, 574. We also consider the degree of prejudice suffered by the defendant as a result of the remark. *State* v. *Ruiz*, 202 Conn. 316, 330, 521 A.2d 1025 (1987).[18]

We cannot say that the state's attorney's use of the words "consciousness of guilt," although in violation of the trial court's ruling, was so unduly offensive to the maintenance of a sound judicial process that reversal of the defendant's conviction is necessary. The state's attorney did not discuss the legal principles of the doctrine, but merely used the title of the doctrine. We

---

[18] This court has noted, however, that "[r]eversal of a conviction under our supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." *State* v. *Ruiz*, supra, 202 Conn. 330; see also *State* v. *Ubaldi*, supra, 190 Conn. 572.

conclude, therefore, that the defendant is not entitled to a new trial on this ground.

### 3

### Expression of Personal Opinion Regarding the Defendant's Guilt

The defendant also claims that the state's attorney improperly expressed his personal opinion regarding the defendant's guilt, thereby depriving him of a fair trial. Specifically, the defendant claims that the state's attorney deprived him of a fair trial by stating: "This is an overwhelming case of guilt. Overwhelming. . . . [Y]ou got an overwhelming case of guilt, actually, guilt beyond all doubt. It's an overwhelming case, so don't let anybody separate out the evidence for you . . . . [The defendant] over there is guilty beyond all doubt. All doubt."

It is axiomatic that it is improper for a prosecutor to express his opinion, directly or indirectly, as to the guilt of the defendant. See *State* v. *Satchwell*, supra, 244 Conn. 579 (*Katz, J.*, concurring). Our review of the record in the present case indicates, however, that any prejudice the defendant may have suffered was remedied sufficiently by the trial court's curative instruction to the jury. With respect to the state's attorney's statements regarding his opinion as to the defendant's guilt, the trial court charged the jury to disregard those comments and to draw no inferences from them. See footnote 13 of this opinion. "The defendant made no claim at trial, nor has he claimed on appeal, that the curative instruction given to the jury was in any way defective. We have often held that a prompt cautionary instruction to the jury regarding improper prosecutorial remarks obviates any possible harm to the defendant. See *State* v. *Nowakowski*, 188 Conn. 620, 624, 452 A.2d 938 (1982); *State* v. *Piskorski*, [177 Conn. 677, 720–21, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d

194 (1979)]; *State* v. *Hawthorne,* [176 Conn. 367, 373, 407 A.2d 1001 (1978)]." *State* v. *Ubaldi,* supra, 190 Conn. 563. We conclude, therefore, that the state's conduct, in light of the trial court's curative instruction, did not so infect the trial with unfairness that the defendant was denied his right to due process. See *State* v. *Williams,* supra, 204 Conn. 539.

4

Injection of Extraneous Matters

The defendant next claims that the state's attorney improperly injected extraneous matters into his closing argument, thereby depriving him of a fair trial. Specifically, the defendant argues that the state's attorney suggested to the jurors that as "members of the community" they had a duty to convict the defendant to protect the future of the community.[19]

"[A] prosecutor should not inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence. . . . It is improper for the prosecutor to encourage the jury to identify with the victim and to predict the effect of a not guilty verdict on him. . . . Nor can the prosecutor imply to the jury that a not guilty verdict will make it responsible for the defendant's future conduct." (Citations omitted.) *State* v. *Williams,* supra, 204 Conn. 547–48.

The state's attorney's suggestion that the jury had a duty, as members of the community, to convict the defendant was clearly an improper argument in that it asked jurors to consider matters not in evidence when deliberating the defendant's guilt. The trial court, how-

[19] The state's attorney made the following statement to the jury: "Now you're here as members of the community. You represent what your community is going to be. Not me. I did my part. The police did their job . . . ." The defendant objected to the state's attorney's suggestion at the end of the state's closing argument, thereby preserving this claim for review.

ever, remedied the impropriety by giving the jury a curative instruction to disregard the state's attorney's comments. See footnote 13 of this opinion. Furthermore, the defendant did not claim that the trial court's curative instruction was insufficient to remedy any prejudice the defendant may have suffered. We conclude, therefore, in light of the trial court's instruction to the jury to disregard these improper prosecutorial remarks, that the state's comments did not deprive the defendant of his right to a fair trial.[20]

B

Unpreserved Claims of Prosecutorial Misconduct

The defendant failed to raise several of his claims of prosecutorial misconduct at trial and, therefore, he seeks review of these issues under *State* v. *Golding*, supra, 213 Conn. 239–40. See footnote 6 of this opinion. We review the defendant's claims because the record is adequate for review and his allegation of prosecutorial misconduct in violation of his right to a fair trial is of constitutional magnitude. The defendant's claims fail under the third prong of *Golding*, however, because the record does not support his claims that he was clearly deprived of a fair trial.

1

Expression of Personal Opinion

The defendant claims that during closing argument, the state's attorney improperly offered his personal

---

[20] The defendant also claims that the state's attorney improperly attacked the defendant and his counsel. The defendant's brief, however, merely quotes part of the transcript and offers no citation or discussion of any authority to explain how the state attacked the defendant and his counsel nor how the attack deprived the defendant of a fair trial. We decline therefore to review these claims. See *Ham* v. *Greene*, 248 Conn. 508, 528 n.11, 729 A.2d 740, cert. denied, 528 U.S. 929, 120 S. Ct. 326, 145 L. Ed. 2d 254 (1999); *Butler* v. *Hartford Technical Institute, Inc.*, 243 Conn. 454, 465 n.11, 704 A.2d 222 (1997); *State* v. *James*, 237 Conn. 390, 396 n.10, 678 A.2d 1338 (1996).

opinion by stating: "Don't go back [into the deliberation room] and throw up your hands [and] be overwhelmed because you [have] all these exhibits out here. I don't know how many exhibits. There is a lot of them. [Do not] [s]ay: 'Oh, my God. Where do we start?' *[This] case is not complicated.* 'What do you mean it's not complicated? You put all [of] these exhibits [into evidence].' *It's not complicated, believe me.* Just don't get overwhelmed when you go back there. . . . *This case is . . . not hard. It's not complicated.*" (Emphasis added.) The defendant claims that it was improper for the state to opine that the case was not complicated. Viewed in the context of the state's entire argument, however, it is evident that the state was merely trying to keep the jury from being overwhelmed by the complexities of serology, PGM and DNA testing and the voluminous number of exhibits that were introduced in this case. We conclude that the state's attorney's comments therefore were not improper in this respect.

2

Experience as a Prosecutor

The defendant also claims that the state's attorney improperly suggested to the jury that it should credit his argument based on his experience as a prosecutor by stating: "I'm going to talk about some of the exhibits and some of the things I think you should look at. Just as if I . . . [were] hired on [your] job to do [your] job. . . . [Y]ou may be there before me and you may say, 'Hey . . . excuse me . . . I've done this before. I've seen this or that. Take a look at that.' You may want to take a look, you may not, but that's what I'm doing here." Although not a model of clarity, the state's attorney's comments were not improper. It appears that he was attempting to explain to the jury what his role was during closing argument and the importance of the jury

paying attention to his summation. Neither topic was inappropriate.

### 3

### Vouching for the Credibility of Witnesses

The defendant contends that the state's attorney improperly vouched for the testimony of Gonzalez by stating: "[D]on't let anybody diminish Jaime Gonzalez to you. Don't let anybody do it. . . . I met Jaime Gonzalez. I talked to Jaime Gonzalez. I felt the worth of his testimony and I presented him here and you saw it and you heard what he had to say. . . . [H]e may not be as articulate as you. He may not have the same background as you, but don't diminish Jaime Gonzalez. Don't do it. . . . [D]on't let anybody come in here and diminish him to you. . . . [Y]ou'll see in [Gonzalez' medical records] where he says he's reliving the horror of this. Jaime Gonzalez is a sensitive kid. He may swear. Don't let anyone diminish him to you. He may be handicapped. He's not stupid."

It is axiomatic that "[t]he prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 541. The state's attorney's remarks that he met and spoke with Gonzalez and "felt the worth of his testimony" were clearly improper in that the state's attorney was vouching for Gonzalez' credibility. Viewed, however, in the context of the entire trial and in light of the trial court's instruction to disregard such comments; see footnote 13 of this opinion; we conclude that these statements were not so egregious that they deprived the defendant of his constitutional right to a fair trial.

The defendant also claims that the state improperly vouched for the testimony of Murphy, the superinten-

dent of the Trinity Apartments, by commenting: "Remember Mrs. Murphy. If you want to know [something], you ask a super. Remember that. She saw [the defendant], had been seeing him around over the day shelter right next to the Trinity Apartments. . . . Now [the defendant is] taken into the police department. Who is there? . . . You know, Mrs. Murphy. Remember that statement? I think it was really the defining one to an extent. If you want to know something, ask the super. She saw him over [at] the day shelter when he came into the area. She had seen him around. And you can just see Mrs. Murphy up in the police department, waiting for her ride, taking everything in. Watching everything. In no hurry to leave. Ask the super. What did she see? His hands are bleeding. She sees blood. She sees it." Arguably, the state's attorney indirectly suggests that the observations to which Murphy had testified were credible simply because she was employed as the building's superintendent. Although improper, we do not agree with the defendant that these comments rise to a level of egregiousness that would warrant a new trial.

4

## Comment on Facts Not in Evidence

The defendant next claims that the state's attorney improperly told the jury that he had instructed a police officer to document Santiago's identification of the defendant from a photographic array by having her sign the back of the defendant's photograph. We disagree.

"A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Citations omitted; inter-

nal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 306, 755 A.2d 868 (2000).

The state claims that the comment from the state's attorney's closing argument that he had instructed a police officer to have Santiago sign the back of the defendant's photograph after Santiago had identified the defendant from a photographic array was based on the evidence in the record and was, therefore, proper. On the basis of our review of the record, we agree with the state that the prosecutor's comments to the jury were based on the evidence.[21] We conclude, therefore, that the state's attorney's comment was not improper.[22]

---

[21] The following colloquy occurred during the state's direct examination of Sergeant Gray of the Waterbury police department:

"Q. Did anyone in any way suggest at all who Ms. Santiago should pick [from the photographic array]?

"A. No.

"Q. And who, if you recall, instructed you—do you recall how you came *to go and document the identification?*

"A. Yes. I received a phone call.

"Q. From where and whom?

"A. From the state's attorney's office and that was yourself."

[22] The defendant also claims that the state improperly used certain colloquialisms and analogies during its closing argument. Specifically, the defendant argues that the state's attorney improperly asserted that the defendant was "caught red-handed" and implied that the defendant was therefore guilty. The defendant contends, citing Webster's Third New International Dictionary, that a person is caught "red-handed" when he is caught with a victim's blood on his hands. The defendant argues therefore that the state's attorney improperly used the idiom because the defendant had his own blood on his hands when he was apprehended. Also, the defendant claims that the state, in an effort to explain the inconsistencies in Santiago's testimony, improperly gave the jury an analogy that each juror would remember getting injured when a "fifty pound can of tomatoes" fell on their foot, but not necessarily remember what color socks they had put on that day. In addition to failing to raise these issues before the trial court, the defendant also has failed to brief adequately these issues for appeal. The defendant's brief merely asserts that the state's attorney improperly made these comments and does not offer any citation or discussion of any authority to explain how the state's use of these comments deprived the defendant of a fair trial. We decline, therefore, to address these claims. See *Ham* v. *Greene*, 248 Conn. 508, 528–29 n.11, 729 A.2d 740, cert. denied, 528 U.S. 929, 120 S. Ct. 326, 145 L. Ed. 2d 254 (1999); *Butler* v. *Hartford Technical Institute*,

## IV

The defendant next claims that the trial court improperly denied him his right to a fair trial before an impartial jury by allowing two state's witnesses to testify about a substance they believed to be blood. Specifically, the defendant argues that the trial court improperly allowed Detectives Michael A. Silva and Robert Finkle to testify that a palm print found on a broken vase at the crime scene was made in blood despite the police department's failure to perform the appropriate tests to ascertain whether the substance was in fact blood. We disagree.

The following facts are necessary to our resolution of this claim. During the state's case-in-chief, Silva, a forensic crime scene technician for the Waterbury police department, testified regarding his observations of Santiago's apartment when he photographed and videotaped it and collected evidence pertaining to the crimes therein. Silva testified that he had discovered a palm print in blood on a broken vase he had found in the apartment. Silva also testified that he did not perform any blood analysis of the palm print.

The state also called Finkle, who was employed as a latent print examiner for the state forensic laboratory at the time of the incident, to testify to his comparative analysis of fingerprints and palm prints found on objects seized from Santiago's apartment and the inked fingerprints of the defendant. After the defendant qualified Finkle as an expert in fingerprint examination and identification, Finkle testified that he had identified the palm print in blood found on the vase as the defendant's. On cross-examination, Finkle acknowledged that he had never tested the palm print in order to determine for certain that the substance was in fact blood. He testified

*Inc.*, 243 Conn. 454, 465 n.11, 704 A.2d 222 (1997); *State* v. *James*, 237 Conn. 390, 396 n.10, 678 A.2d 1338 (1996).

that the substance had reacted to certain chemical reagents consistent with the way that blood would react. Finkle conceded, however, that there are numerous organic substances that would cause the same reaction. The defendant also elicited from Raffin, the state's serology expert witness, that the vase was never submitted to her for a blood analysis.

Thereafter, in its closing argument, the state urged the jury to consider as evidence the "palm print in blood" found on the broken vase. The defendant responded by arguing to the jury that no one actually knew what the substance was because it never had been tested to determine whether it was blood. In its rebuttal argument, the state repeated that the palm print was made in blood and explained to the jury that a blood analysis was not performed on the stain because such a test would have ruined the print sample.

The defendant claims that the trial court improperly allowed Silva and Finkle to testify that the palm print found on the broken vase had been made in blood because the state had never tested the substance to authenticate such testimony. Further, the defendant argues that, in light of the state's failure to test the substance for the presence of blood, it improperly had argued to the jury that the substance was blood. Relying on *State* v. *Moody*, 214 Conn. 616, 573 A.2d 716 (1990), the defendant claims that the improper testimony and closing argument misled the jury to conclude that the substance was blood, thereby affecting the outcome of his trial. The defendant acknowledges that he failed properly to preserve this claim by raising it in the trial court. The defendant requests, therefore, that we review this claim under either *Golding*; see footnote 6 of this opinion; or the plain error doctrine, or in the exercise of our supervisory authority over the administration of justice, grant him a new trial.

We conclude that the defendant's first unpreserved claim fails the second prong of *Golding* because his claim that the trial court improperly allowed the state's witnesses to testify that the defendant's palm print on the vase was made in blood is evidentiary in nature and not of constitutional magnitude. See *State* v. *Taylor*, 239 Conn. 481, 502–503, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); *State* v. *Paulino*, 223 Conn. 461, 478, 613 A.2d 720 (1992); *State* v. *Castonguay*, 218 Conn. 486, 504, 590 A.2d 901 (1991). As we have stated on numerous occasions, a party cannot transform a nonconstitutional claim into a constitutional claim simply by virtue of the label placed upon it. See, e.g., *State* v. *Schiappa*, 248 Conn. 132, 164, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999).

The defendant's related claim that the state's attorney improperly argued to the jury that the palm print was made in blood also fails the second prong of *Golding*. We have long held that "[*Golding*] review of such a claim is unavailable where the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial . . . because in such a case the claimed misconduct is insufficient to infect the fundamental fairness of the trial itself." (Citation omitted; internal quotation marks omitted.) *State* v. *Atkinson*, supra, 235 Conn. 769. We conclude that the state's attorney's assertion that the defendant's palm print was made in blood did not reach the level of egregiousness that would infect the fundamental fairness of the trial itself.

We also decline to review the defendant's claim under the plain error doctrine. "Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial

proceedings." (Internal quotation marks omitted.) *State v. Taylor*, supra, 239 Conn. 502. Furthermore, the "defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . . Moreover, because the claim raised here is nonconstitutional, the defendant must demonstrate that the trial court's improper action likely affected the result of his trial." (Citation omitted; internal quotation marks omitted.) *State v. Cobb*, 251 Conn. 285, 389, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); see Practice Book § 60-5.[23] The defendant has not met this burden.

The defendant, relying on *State v. Moody*, supra, 214 Conn. 616, claims that the improper testimony and closing argument misled the jury to conclude that the substance was blood, thereby affecting the result of his trial. In *Moody*, we reversed the defendant's murder conviction because we concluded that the trial court had abused its discretion when it admitted into evidence the result of a " 'presumptive test for blood' " performed on a stain found on the sole of the defendant's shoe. Id., 629–30. The defendant had sought to preclude a state's witness from testifying that a stain on the sole of his shoe tested positively in a presumptive test for blood. Id., 628. The trial court denied the motion and noted the defendant's exception. Id. Thereafter, the state's witness testified as to the results and further explained that the positive result of the presumptive test meant that the stain could have been human blood, animal blood, or something other than blood. Id., 627–

---

[23] Practice Book § 60-5 provides in relevant part: "The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law. . . . The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

28. The state had conducted only a presumptive test for blood because the stain was too small for the actual test for blood. Id., 628.

We concluded that "the result of the 'presumptive test for blood' had no probative value whatsoever" because the test "did nothing toward establishing the likelihood of the presence of human blood on the sole of the defendant's shoe." Id. We therefore held that the trial court abused its discretion in denying the defendant's motion in limine because the test was irrelevant. Id. We also concluded that the admitted testimony, more probably than not, misled the jury and affected the result of the defendant's trial based upon a note sent by the jury to the court during its deliberations requesting that the testimony be reread.[24] Id., 629. Because the note clearly indicated that the jury found the testimony important and undeniably was misled, we concluded that the trial court's failure to grant the defendant's motion was harmful. Id., 630.

We agree with the defendant that, in light of the state's failure to test the stain for the presence of blood, it was improper for the state's witnesses to testify and for the state's attorney to argue that the palm print found on the vase had been made in blood. Although Finkle had assumed that the substance was blood because of its reaction to certain chemical reagents, it could not be determined for certain whether the stain was indeed blood. The similarities, however, between this case and *Moody* end here. Unlike in *Moody*, there is no indication in the record in the present case that the jury was misled by the description of the stain as blood. Furthermore, although the state had not tested the stain found on the broken vase for the presence of

---

[24] The note from the jury in *Moody* informed the court that it wanted "to rehear the testimony regarding: '[W]hat shoe blood found on.'" *State* v. *Moody*, supra, 214 Conn. 629.

blood, evidence of the stain was not wholly irrelevant. Finkle's testimony that he had found the defendant's palm print on the broken vase was undisputed. This fact is important because Finkle's testimony corroborated Santiago's testimony that she had witnessed the defendant break the vase over Rosado's head. Furthermore, there was overwhelming evidence of the defendant's guilt, rendering such an impropriety harmless. We conclude, therefore, that although improper, the representation of the palm print as being bloody was not so harmful that it likely affected the result of the defendant's trial, resulting in manifest injustice. See *State* v. *Cobb*, supra, 251 Conn. 389; *State* v. *Taylor*, supra, 239 Conn. 502.[25]

V

The defendant next claims that the trial court improperly failed to instruct the jury regarding the state's burden of proof as requested by the defendant. Specifically, the defendant argues that the trial court improperly refused to instruct the jury that: (1) under the state's theory of the case, the state had to prove beyond a reasonable doubt that the defendant had committed the offenses charged while acting alone; and (2) if the jury had a reasonable doubt whether a fifth, unknown, bleeding person was present during the commission of the offenses, it had to acquit the defendant of the offenses charged. We do not agree.

The following procedural history is relevant to our resolution of this claim. At the close of evidence, the defendant filed a request to charge, entitled "Accessory," requesting that the trial court instruct the jury that it must render a verdict of not guilty if it found that the state had failed to prove beyond a reasonable

---

[25] In light of our conclusion that the state's remarks were harmless, we also decline the defendant's request to invoke our supervisory authority over the administration of justice to grant him a new trial.

doubt that the defendant, acting alone, had committed the crimes alleged, or that a person other than the defendant had committed the crimes alleged. The trial court refused to give the instruction and the defendant took an exception.

The trial court instead instructed the jury in relevant part as follows: "Identification is a question of fact for you to decide, taking into consideration all the evidence that you have seen and heard in the course of [the] trial. The state has the burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the crime. The identification of the defendant by a single witness as the one involved in the commission of a crime is in and of itself sufficient to justify a conviction of such person, provided, of course, that you are satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime."

"It is settled law that a defendant who has produced evidence supporting a legally recognized defense is entitled, as a matter of law, to a theory of defense instruction, and that the denial of such an instruction is a violation of due process." *State* v. *Small*, 242 Conn. 93, 104, 700 A.2d 617 (1997). "[A] request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . A refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance. . . . A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal quotation marks omitted.) *State* v. *Kaddah*, 250 Conn. 563, 579, 736 A.2d 902 (1999).

The defendant argues that the state's theory of the case was that he, acting alone, committed the crimes alleged. The defendant also contends that he asserted the defense of mistaken identity. Therefore, according to the defendant, the trial court's failure to give the jury the requested instruction misled the jury into believing that it could convict the defendant even if it had found that a fifth person had also been present during the commission of the crimes.

The state counters that the defendant's requested charge was not a correct statement of the law. The state argues that it is required to prove all of the essential elements of the offenses charged beyond a reasonable doubt in order to obtain a conviction. The state contends that the trial court, therefore, properly refused to give the defendant's requested charge because it incorrectly included the words "acting alone," which is not an element of murder, manslaughter, or robbery. The state also argues that a jury may return a verdict of guilty on the charges against the defendant without accepting the state's theory of the case in its entirety. The state claims, therefore, that the jury could have found the defendant guilty even if it also had found that a fifth, unknown person had been present during the commission of the crimes.[26]

After reviewing the trial court's charge in its entirety, we conclude that the court's charge properly instructed the jury with regard to the defendant's theory of the case, namely, mistaken identity. The trial court charged the jury in relevant part: "[T]he state must prove beyond a reasonable doubt not only the offenses that were committed and alleged in the information, but that the defendant was the person who committed [them]. You

---

[26] In the alternative, the state also claims that the trial court implicitly gave the defendant's requested charge. We need not consider this claim, however, in light of our conclusion.

must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him. The defendant denies that he is the person who was involved in the commission of the alleged offenses. He is thus raising the issue of *mistaken identity*." (Emphasis added.) The trial court properly charged the jury that the state had to prove beyond a reasonable doubt that the defendant had committed the offenses charged and that the jury should consider the defendant's defense of mistaken identity and the evidence he had submitted in support of that defense.

We agree with the state that the trial court did not need to instruct the jury that the state had to prove beyond a reasonable doubt that the defendant had committed the crimes while acting alone. First, the defendant's requested charge that the state had to prove beyond a reasonable doubt that he was acting alone when he committed the crimes charged is not an element of murder, felony murder, manslaughter in the first degree, or robbery in the first degree. See General Statutes §§ 53a-54a, 53a-54c, 53a-55 (a) (1) and 53a-134 (a) (3). Second, the jury was not required to acquit the defendant if it found that a fifth person was present during the commission of the crimes. Despite the state's theory of the case, the presence of a fifth person, in and of itself, would not preclude the defendant from being found guilty of these crimes. The state had to prove every element of the crimes charged beyond a reasonable doubt, not every detail of the state's theory of the case. "Although some evidence may be inconsistent with the state's theory of the case, the jury is not bound to credit only that evidence to the exclusion of evidence consistent with the state's theory." *State* v. *Salz*, 226 Conn. 20, 29–30, 627 A.2d 862 (1993). We conclude, therefore, that the trial court's instruction provided the jury with a clear understanding of the elements of the crimes charged, and afforded it proper

guidance in deciding whether the state had proved the elements of the crimes charged beyond a reasonable doubt.

## VI

The defendant's next claim is that in its charge to the jury, the trial court improperly referred to the defendant's choice not to take the stand in his own defense as a "failure to testify" rather than as a "decision not to testify," as requested by the defendant. In our recent decision in *State* v. *Casanova*, 255 Conn. 581, 600–601, 767 A.2d 1189 (2001), which was released after the defendant in the present case filed his briefs with this court, we held that the Appellate Court properly concluded that the trial court did not abuse its discretion in deciding not to use the "neutral" language suggested by the defendant and instead instructing the jury that it could not draw a negative inference from the defendant's "failure to testify." We concluded that the trial court's instruction, in its entirety, was "neither negative in substance nor improper," and that there is no requirement in General Statutes § 54-84 (b) that a trial court must use the language requested by a defendant when he chooses not to testify. Id., 599–600. After a review of the trial court's charge in the present case, we similarly conclude that the charge was "neither negative in substance nor improper" in referring to the defendant's decision not to testify as a "failure to testify."[27] Id., 599.

## VII

The defendant next claims that the trial court improperly violated his state and federal constitutional rights

[27] The trial court instructed the jury as follows: "[T]he defendant in this case has not testified. An accused person has the *option* to testify or not to testify at the trial. He is under *no obligation* to testify in his own behalf. He has a *constitutional right* not to testify. You must not draw any unfavorable inferences from the defendant's failure to testify." (Emphasis added.) See *State* v. *Casanova*, supra, 255 Conn. 599–600 (discussing same instruction).

against double jeopardy. Specifically, the defendant claims that the trial court improperly violated his rights by convicting and sentencing him for both murder and felony murder for the death of Rosado. We agree with the defendant's double jeopardy claim and reverse the judgment in part.

The following facts are pertinent to our conclusion regarding this claim. The defendant filed a pretrial motion to dismiss the state's substitute information charging him with murder, felony murder and manslaughter in the first degree on the ground that the multiple charges violated his protection against double jeopardy. The defendant moved the trial court to order the state to file an amended substitute information. The trial court denied the motion, finding that the information was proper because the double jeopardy clause protects against multiple punishments for the same offense, not multiple charges for the same offense.

At trial, the jury found the defendant guilty of one count each of murder, felony murder and manslaughter in the first degree, and two counts of robbery in the first degree. Following the jury verdict, the defendant renewed his motion to dismiss, arguing that the court must dismiss the counts of felony murder and manslaughter in the first degree because, in light of the defendant's conviction on both counts, a sentence for murder, felony murder, and manslaughter would violate his rights against double jeopardy. The trial court denied the motion. Thereafter, the trial court sentenced the defendant to sixty years imprisonment for the murder conviction, sixty years imprisonment for the felony murder conviction, concurrent with the murder count, twenty years imprisonment for each of the robbery counts, one sentence to be concurrent with the murder and the felony murder convictions, the second to be concurrent with the murder and the felony murder convictions but consecutive to the other robbery convic-

tion. The court merged the manslaughter conviction with the murder conviction, and imposed no sentence for the manslaughter conviction.

The state concedes that the trial court improperly sentenced the defendant for both murder and felony murder for the death of Rosado. The state contends that the proper remedy is to combine the defendant's convictions of murder and felony murder and vacate the sentence on the felony murder conviction. We agree.

The double jeopardy clause of the fifth amendment to the United States constitution, which is applicable to the states through the due process clause of the fourteenth amendment, protects against multiple punishments for the same offense in a single trial. *North Carolina* v. *Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969); *State* v. *Lewis*, 245 Conn. 779, 818, 717 A.2d 1140 (1998). We have also held that the due process guarantees of article first, § 9, of the Connecticut constitution include protection against double jeopardy. *State* v. *Chicano*, 216 Conn. 699, 706, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). "An indictment charging an accused with intentional and felony murder of a particular victim charges a single offense, committed conjunctively in two different ways." *State* v. *Couture*, supra, 194 Conn. 560. Thus, the trial court improperly sentenced the defendant for both murder and felony murder for Rosado's death. See *State* v. *Cator*, 256 Conn. 785, 803, 781 A.2d 285 (2001); *State* v. *Montgomery*, 254 Conn. 694, 697 n.6, 759 A.2d 995 (2000); *State* v. *Lewis*, supra, 819. The proper remedy is to combine the defendant's conviction of felony murder with his conviction of intentional murder, and vacate the felony murder sentence. *State* v. *Lewis*, supra, 819; *State* v. *Chicano*, supra, 713–14. Accordingly, we remand the case to the trial court to combine the defendant's convictions of

felony murder and intentional murder and to vacate the sentence for the felony murder conviction.

## VIII

The defendant also claims that the trial court's jury charge improperly led the jury to return guilty verdicts for both murder and manslaughter in the first degree for the same victim in violation of his constitutional protection against double jeopardy. The defendant argues, therefore, that the manslaughter conviction must be set aside and "erased from the record . . . ." We agree.

The following facts are necessary for our resolution of this claim. As set forth in part VII of this opinion, prior to trial, the defendant filed a motion to dismiss the state's substitute information charging him with murder, felony murder and manslaughter in the first degree on the ground that the multiple charges violated his protection against double jeopardy. During argument on this motion, the defendant claimed that the information improperly charged the defendant with murder and manslaughter as separate offenses and would likely confuse the jury during their deliberations. He argued that the trial court should direct the state to remove the manslaughter charge from the information and instruct the jury on manslaughter as a lesser included offense of murder. The trial court denied the defendant's motion, finding that the information properly charged the defendant with alternate offenses. The trial court agreed, however, to instruct the jury to consider the manslaughter count as a lesser included offense.

During its instructions on the intentional murder and manslaughter charges, the trial court instructed the jury on the elements of murder and on the law of lesser

included offenses.[28] After charging the jury on the elements of manslaughter in the first degree, the trial court instructed the jury as follows: "[B]ecause the information charges murder and two different ways of committing manslaughter in the first degree, intentional [homicide] in count three and reckless [homicide] in count four, you must be careful not to render inconsistent verdicts. Now the following [is a] suggestion I make to you as to the possible verdicts that you may render. . . . [T]his applies only to counts one [intentional murder], three [intentional manslaughter in the first degree], and four [reckless indifference manslaughter in the first degree] . . . .

"Now, with respect to count one, murder, you may find the defendant guilty or not guilty. If you find the defendant guilty of murder in count one, then you must find him guilty of count three, intentional manslaughter [in the first degree], and not guilty of count four, [reckless indifference] manslaughter in the first degree . . . . And that is because you cannot do something both intentionally and recklessly. That verdict would be inconsistent otherwise." The defendant did not object to the trial court's charge.

After deliberations, the jury, in accordance with the trial court's instructions, found the defendant guilty of intentional manslaughter in the first degree and not guilty of reckless indifference manslaughter in the first degree after it had found the defendant guilty of intentional murder. Prior to sentencing, the defendant

---

[28] The trial court instructed the jury as follows: "Under [the law of lesser included offenses], if, and only if, you find that the proof is not sufficient to justify a conviction of the crime of murder charged in count one, then you must go on to consider whether it is sufficient to establish beyond a reasonable doubt the defendant's guilt of the lesser included crimes of manslaughter in the first degree as charged in counts three and four . . . . However, I want to emphasize to you that before you consider any lesser included offense . . . you must first . . . unanimously find that the defendant is not guilty of the crime of murder as charged in count one."

renewed his motion to dismiss the count of manslaughter on the ground that the jury improperly had convicted him of both murder and intentional manslaughter. The trial court declined to dismiss the manslaughter conviction, but combined the manslaughter conviction with the murder conviction and did not impose a sentence for the manslaughter conviction. The defendant did not object to the trial court's action.

"In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Delvalle*, 250 Conn. 466, 470, 736 A.2d 125 (1999).

The defendant claims that although the trial court properly charged the jury with an acquittal first instruction; see footnote 28 of this opinion; it improperly directed the jury to find the defendant guilty of intentional manslaughter in the first degree in the event that it first had found him guilty of intentional murder. Relying on *State* v. *Sawyer*, 227 Conn. 566, 630 A.2d 1064 (1993), the defendant contends that when the jury convicted the defendant of intentional murder, the trial court should not have allowed it to deliberate on the lesser included offense of intentional manslaughter in the first degree. He claims that the jury's verdicts of guilty as to the murder count and the intentional manslaughter count therefore violate his state and federal constitutional rights against double jeopardy. The

defendant asserts that the trial court's remedy of not sentencing him on the manslaughter count was insufficient to protect his rights. He asks us to "erase" the intentional manslaughter conviction from the judgment file and mittimus so that it shows only a conviction for intentional murder.

The state responds that the doctrine of double jeopardy protects defendants from multiple punishments, not multiple convictions. The state claims that the trial court properly combined the defendant's convictions for intentional murder and intentional manslaughter and imposed one sentence for the murder conviction. The state argues that the trial court therefore did not violate the defendant's right against double jeopardy.

In *State* v. *Sawyer*, supra, 227 Conn. 583, we concluded that, to assist the jury in making the transition from consideration of the greater offense to consideration of one or more lesser included offenses, the trial court must charge the jury with an acquittal first instruction. "Only after it has confronted and unanimously completed the difficult task of deciding the guilt or innocence of the accused as to the charged offense should the jury consider lesser included offenses. Anything less dilutes the right of the state and the defendant to have the jury give its undivided attention and most serious deliberations to the offense with which the defendant is charged . . . ." Id. The defendant relies on *Sawyer* to support his assertion that the jury could have found him guilty either of the greater offense of intentional murder or the lesser offense of intentional manslaughter in the first degree, but not both. See also *State* v. *Abdalaziz*, 248 Conn. 430, 435, 729 A.2d 725 (1999) ("a defendant can be found guilty either of the greater offense or the lesser offense, but not both").

We agree with the defendant that the trial court improperly directed the jury to find the defendant guilty

of intentional manslaughter in the first degree in the event that it found him guilty of intentional murder. The trial court's improper instruction is not one, however, that warrants a new trial because it properly charged the jury with an acquittal first instruction and the jury apparently followed that instruction by first deliberating and resolving the intentional murder count. The jury found the defendant guilty of intentional manslaughter in the first degree only because it was directed to do so *automatically* in the event that it had found the defendant guilty of murder. Therefore, the appropriate relief is to reverse the judgment of conviction of manslaughter in the first degree and to vacate the sentence on that charge. Accordingly, we remand the case to the trial court to vacate the defendant's manslaughter conviction.

## IX

The defendant's final claim is that the trial court improperly instructed the jury concerning proof beyond a reasonable doubt, resulting in a violation of his federal constitutional right to a proper instruction concerning the state's burden of proof.[29] Specifically, the defendant

---

[29] During its instructions on proof beyond a reasonable doubt, the trial court charged the jury: "[W]hat does that mean, 'beyond a reasonable doubt?' The phrase 'beyond a reasonable doubt' has no technical or unusual meaning. You can arrive at the real meaning of it by emphasizing the word 'reasonable.' A reasonable doubt means a doubt founded upon reason or common sense. As the words imply, it is a doubt held by a reasonable person after all the evidence in the case is carefully analyzed, compared and weighed. A reasonable doubt may arise not only from the evidence produced, but also from a lack of evidence. Since the burden is upon the state to prove a defendant guilty beyond a reasonable doubt of every essential element of the crime charged, a defendant has a right to rely upon a failure of the prosecution to establish such proof.

"A reasonable doubt is a doubt for which a valid reason can be assigned. It is a doubt which is something more than a guess or a surmise. It is not a conjecture or fanciful doubt. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubts. Nor is it a doubt suggested by counsel or any of the jurors which is not justified by the evidence or lack of evidence.

"A reasonable doubt is a doubt based on reason and not on the mere

argues that the trial court's instruction improperly diluted the state's burden of proof by equating proof beyond a reasonable doubt with: (1) a "settled and abiding belief" in the defendant's guilt; (2) "real doubt" and "honest doubt"; and (3) the jury's own serious affairs or matters. The defendant also claims that the trial court improperly instructed the jury that: (1) the

possibility of innocence. It is doubt for which you can in your own mind conscientiously give a reason. A reasonable doubt, in other words, is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence. It is the kind of doubt which in the serious affairs which concern you in everyday life you would pay heed and attention to. Reasonable doubt is the kind of doubt upon which reasonable persons like yourselves in the more serious and important affairs in your own lives would hesitate to act. It is not hesitation, however, springing from any feelings of pity or sympathy for the accused or any other person who might be affected by your decision.

"On the other hand, if all the evidence has been impartially and thoroughly reviewed by you and it produces in your minds a settled and abiding belief that you would be willing to act upon in the matters of the highest importance relating to your own affairs, then, in that event, you would be free from a reasonable doubt and you should declare the defendant to be guilty.

"If, however, on the evidence you have a reasonable doubt as to the guilt of the defendant, you must find him not guilty.

"Now, of course, absolute certainty in the affairs of life is almost never attainable. And the law does not require absolute certainty on the part of the jury before you return a verdict of guilty. The state does not have to prove guilt beyond all doubt or to a mathematical or absolute certainty or to an absolute perfect case. Criminal cases are not prosecuted on the basis of evidence that is 100 percent perfect. That would be an impossibility.

"What the law does require, however, is that after hearing all the evidence, if there is something in that evidence or lack of evidence which leaves in the minds of the jury, as reasonable men and women, a reasonable doubt about the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. If there is no reasonable doubt, then the accused must be found guilty.

"Proof beyond a reasonable doubt is proof which precludes every reasonable hypothesis except guilt, is consistent with guilt and is inconsistent with any other reasonable conclusion. If you can, in reason, reconcile all of the facts proved with any reasonable theory consistent with the innocence of the accused, then you cannot find him guilty. The standard of proof applies to each and every count equally. The state must prove beyond a reasonable doubt not only that the crime was committed as alleged in the information, but that the defendant was the person who committed it."

jury could only have reasonable doubt for a "valid reason"; (2) reasonable doubt is not a doubt suggested by counsel or jurors that is not justified by the evidence or lack thereof; and (3) reasonable doubt is "not [based] on the mere possibility of innocence."[30] We do not agree.

With the exception of the "settled and abiding belief" language, the defendant's request to charge regarding reasonable doubt contained the very language he now asserts is improper.[31] He also failed to take exception to the trial court's reasonable doubt instruction. The defendant seeks review of this issue under *Golding*. See footnote 6 of this opinion. The court may reject an unpreserved claim of constitutional violation for failure to meet any one of the *Golding* requirements. *State* v. *Woods*, 250 Conn. 807, 815, 740 A.2d 371 (1999). We conclude that the defendant has not met the third prong

---

[30] The defendant contends that the trial court's instructions improperly diluted the state's burden of proof and violated his federal constitutional rights, and he therefore requests a new trial. The defendant has failed, however, to indicate exactly which of his federal constitutional rights were violated. On the basis of the cases cited in the defendant's brief, which analyze a defendant's rights to due process under the fourteenth amendment to the United States constitution, we assume that the defendant is also referring to his right to due process under the fourteenth amendment. See *Cage* v. *Louisiana*, 498 U.S. 39, 39–40, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

[31] The defendant conceded in his brief that he had requested most of the language he now challenges. Although "error induced by an appellant cannot be a ground for reversal and will not be reviewed"; *State* v. *Hinckley*, 198 Conn. 77, 81 n.2, 502 A.2d 388 (1985); where the claim is of constitutional magnitude, it may be reviewed pursuant to *Golding*. See *State* v. *Scognamiglio*, 202 Conn. 18, 26, 519 A.2d 607 (1987); *State* v. *Grenier*, 55 Conn. App. 630, 650, 739 A.2d 751 (1999), rev'd on other grounds, 257 Conn. 797, 778 A.2d 159 (2001); *State* v. *Hanks*, 39 Conn. App. 333, 344, 665 A.2d 102, cert. denied, 235 Conn. 926, 666 A.2d 1187 (1995); *State* v. *Edwards*, 39 Conn. App. 242, 251–52, 665 A.2d 611, cert. denied, 235 Conn. 924, 925, 666 A.2d 1186, 1187 (1995); *State* v. *Boyd*, 36 Conn. App. 516, 521, 651 A.2d 1313, cert. denied, 232 Conn. 912, 654 A.2d 356, cert. denied, 516 U.S. 828, 116 S. Ct. 98, 133 L. Ed. 2d 53 (1995); *State* v. *Murdick*, 23 Conn. App. 692, 702, 583 A.2d 1318, cert. denied, 217 Conn. 809, 585 A.2d 1233 (1991); see also *State* v. *Hinckley*, supra, 81 n.2; but see *State* v. *Zollo*, 36 Conn. App. 718, 736, 654 A.2d 359, cert. denied, 234 Conn. 906, 660 A.2d 859 (1995).

of *Golding*, namely, that the alleged violation existed and deprived him of a fair trial.

"It is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) . . . . The [reasonable doubt concept] provides concrete substance for the presumption of innocence— that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . [Id.], 363. At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. *Jackson* v. *Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979). [Consequently, the] defendants in a criminal case are entitled to a clear and unequivocal charge by the court that the guilt of the defendants must be proved beyond a reasonable doubt. . . . *State* v. *DelVecchio*, 191 Conn. 412, 419–20, 464 A.2d 813 (1983)." (Internal quotation marks omitted.) *State* v. *Velasco*, supra, 253 Conn. 247.

When determining whether it was reasonably possible that the jury was misled by the trial court's instructions, we will review the charge as a whole and consider "its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Delvalle*, supra, 250 Conn. 470.

The defendant acknowledges that in previous decisions this court has either approved of the challenged language contained within the trial court's instruction

on reasonable doubt or found that it was not per se harmful. See, e.g., *State* v. *Hines*, 243 Conn. 796, 816–20, 709 A.2d 522 (1998) (upholding instruction on reasonable doubt that included language "a real doubt, an honest doubt"). He asks us, however, to reconsider our previous decisions that have rejected challenges similar to the ones he has raised.

We consistently have held that the definition of reasonable doubt as "a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence," as "a doubt for which a valid reason can be assigned," and as a "doubt which in the serious affairs which concern you in everyday life you would pay heed and attention to" does not dilute the state's burden of proof when such definitions are viewed in the context of an entire charge. See, e.g., *State* v. *Velasco*, supra, 253 Conn. 248; *State* v. *Morant*, 242 Conn. 666, 688, 701 A.2d 1 (1997); *State* v. *Kelley*, 229 Conn. 557, 567–68, 643 A.2d 854 (1994); *State* v. *Smith*, 210 Conn. 132, 147–50, 554 A.2d 713 (1989). We also have condoned instructions that similarly explained that reasonable doubt was not "doubt suggested by counsel," concluding that the language did not dilute the state's burden of proof or otherwise mislead the jury when properly considered in the broader context of the trial court's instructions in their entirety. See *State* v. *Delvalle*, supra, 250 Conn. 473–74; *State* v. *Taylor*, supra, 239 Conn. 504–505.[32] In *State* v. *Blackman*, 246 Conn. 547, 562–63, 716 A.2d 101 (1998), we held that a trial court's instruction that reasonable doubt " 'is a doubt based on reason and not on the mere possibility of innocence' " did not unconstitutionally dilute the state's burden, and adequately advised the jury on the state's

---

[32] We note that although we have condoned the language, we have urged trial courts to avoid charging the jury that reasonable doubt is not "doubt suggested by counsel." See *State* v. *Delvalle*, supra, 250 Conn. 475; *State* v. *Taylor*, supra, 239 Conn. 504.

burden in the context of the rest of the charge on reasonable doubt. Finally, our Appellate Court repeatedly has concluded that instructions that use the language "settled and abiding belief" or similar language are harmless if, in the context of the charge as a whole, it does not result in juror misunderstanding regarding the state's burden of proving the defendant's guilt beyond a reasonable doubt. See *State* v. *Leroy*, 38 Conn. App. 282, 288–89, 661 A.2d 106, cert. denied, 235 Conn. 904, 665 A.2d 904 (1995); *State* v. *DeWitt*, 28 Conn. App. 638, 643–45, 611 A.2d 926, cert. denied, 224 Conn. 903, 615 A.2d 1045 (1992); *State* v. *Falcon*, 26 Conn. App. 259, 269–70, 600 A.2d 1364 (1991), cert. denied, 221 Conn. 911, 602 A.2d 10 (1992); *State* v. *Ober*, 24 Conn. App. 347, 358–59, 588 A.2d 1080, cert. denied, 219 Conn. 909, 593 A.2d 134, 135, cert. denied, 502 U.S. 915, 112 S. Ct. 319, 116 L. Ed. 2d 260 (1991); see also *State* v. *Pinnock*, 220 Conn. 765, 793, 601 A.2d 521 (1992) (instruction containing words " 'settled and abiding belief' " upheld).

The defendant has offered no compelling reason to reconsider these cases. Furthermore, we see no reasonable possibility that the challenged language, when viewed in the context of the charge as a whole; see footnote 29 of this opinion; misled the jury in its understanding of the state's burden of proving the defendant's guilt beyond a reasonable doubt. See *State* v. *Delvalle*, supra, 250 Conn. 474. Accordingly, we conclude that the defendant cannot prevail under *Golding*.

The judgment is reversed in part and the case is remanded to the trial court with direction to combine the defendant's conviction of felony murder with his conviction of intentional murder and to vacate the felony murder sentence, and to reverse the defendant's conviction of manslaughter in the first degree; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.